**VERTECS CORPORATION, Appellant,**

v.

**REICHHOLD CHEMICALS, INC., Appellee.**

**No. 6566.**

Supreme Court of Alaska.

March 25, 1983.

Robert J. Dickson, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellant.

James N. Leik and Bruce A. Bookman, Perkins, Coie, Stone, Olsen & Williams, Anchorage, for appellee.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ.

OPINION

MATTHEWS, Justice.

Vertecs Corporation (Vertecs) appeals from a judgment of dismissal following a grant of summary judgment on Vertecs' crossclaim against co-defendant Reichhold Chemicals, Inc. (Reichhold). The crossclaim sought contribution and indemnity from Reichhold for any liability that Vertecs owed to the plaintiffs in a multi-party action stemming from a fire in Yakutat in 1977 that destroyed a fish processing and cold storage plant. This case squarely presents the issue whether Alaska law should recognize a claim for non-contractual implied indemnity between concurrently negligent tortfeasors. We conclude that it should not, and therefore affirm.

In 1970, the City of Yakutat contracted to have a cold storage plant built at Yakutat, Alaska. Late that year, while the plant was still under construction, moisture was condensing on exposed steel portions of the interior of the roof of the building because of the cold weather outside and the heat inside the building. This condensation was hindering completion of the building's interior. KPFF, the firm that designed the building, asked general contractor Chris Berg, Inc. to propose methods of alleviating the condensation problem. Architect Albert Kelly ultimately chose an interior application of polyurethane foam insulation from among the various alternatives, largely because foam insulation was the cheapest way to solve the problem. After a series of negotiations, Chris Berg subcontracted with Vertecs to install the needed foam insulation. Reichhold, a supplier of the components that are mixed and applied to form polyurethane foam insulation, provided a portion of the foam that Vertecs applied in Yakutat. Vertecs' employees substantially completed the installation of the insulation by late January 1971.

Following the plant's completion, the City leased it to various tenants. On May 13, 1977, while the Yakutat Fishermen's Cooperative was the tenant, the plant was destroyed by a fire that followed the explosion of a boiler in the plant. The explosion caused the false plywood ceiling in the boiler room to part, exposing the foam insulation on the underside of the plant roof to the ensuing flames. The foam insulation on the interior of the roof allegedly enhanced the resulting fire damage.

On May 11, 1979, co-plaintiffs City of Yakutat and Yakutat Fishermen's Cooperative filed an amended complaint in the superior court, Third Judicial District, naming fifteen defendants, including Vertecs and Reichhold. The complaint alleged that Vertecs had negligently applied foam insulation to the interior of the roof of the fish processing plant, and that it had negligently failed to warn Yakutat of the flammability dangers posed by the foam insulation. The plaintiffs alleged eight causes of action against Reichhold, including intentional and negligent misrepresentation regarding the flammability characteristics of the foam that Reichhold had supplied to Vertecs, negligent failure to warn of the foam's flammability, and various strict liability in tort claims.

In March 1981, Reichhold settled with the plaintiffs for $275,000, plus a guarantee of an additional $475,000 if that much was not obtained from the remaining defendants. The plaintiffs released Reichhold and the action against it was dismissed with prejudice on April 13, 1981.

On March 3, 1981, Vertecs filed a crossclaim against Reichhold, seeking contribution and indemnity for any liability of Vertecs to the plaintiffs. As grounds for indemnity, it alleged that its negligence, if any, was passive while Reichhold's negligence was active. Vertecs also alleged purported independent causes of action against Reichhold for strict liability in tort, breach of warranty, negligent manufacture, and negligent and intentional misrepresentation; however, the claim for relief under each of these supposedly independent causes of action was for "indemnity" of all liability of Vertecs to the plaintiffs.

After answering the crossclaim, Reichhold moved alternatively for dismissal or summary judgment. It contended that contribution was improper because it had settled and obtained a release, and that indemnity would not lie because any liability of Vertecs would be due to its own affirmative negligent acts. Judge Milton M. Souter held a hearing on the motion on August 14, 1981. After holding that Alaska law controlled in the suit,[1] he determined that Alaska law did not provide for indemnity between concurrently negligent tortfeasors. Since only fault-based claims had been alleged against Vertecs, he ruled that it could not obtain indemnity, and therefore grant-

---

1. Reichhold had alleged that Washington law applied. This ruling is not an issue in this appeal.

ed summary judgment on the indemnity claim. In its Order Granting Summary Judgment, the superior court also determined that summary judgment on the contribution claim was proper since Reichhold had settled in good faith with the plaintiffs.[2] Judgment dismissing Vertecs' cross-claim was entered on December 4, 1981, and on December 24, 1981, Vertecs appealed.

## I

The common law did not recognize contribution among tortfeasors. Courts would not reward a wrongdoer by allowing him to wholly or partially shift his loss to another. As between wrongdoers, each of whom was personally at fault for an injury, courts would not deign to measure degrees of fault with a concomitant sharing of losses among the tortfeasors. However, the parallel principle of indemnity arose early on in England. Indemnity provided for a complete shifting of liability from one party to another in cases where a party was held only vicariously liable. Thus, an employer who was held liable for the defalcation of an employee on the theory of respondeat superior could recover over against the employee via indemnity.

However, the courts began to discover that the bar to contribution among fault-bearing tortfeasors worked injustice in certain cases. Some courts thus expanded indemnity to include cases in which the indemnitee, while to some degree personally at fault, was much less culpable than the indemnitor. Various appositive phrases arose to describe the situations in which indemnity would be allowed, including "primary-secondary negligence," "misfeasance-nonfeasance," and "active-passive negligence." However, most authorities agree that these phrases were merely labels given to a fact-finding concept wherein courts allowed total loss-shifting because they felt that justice and fairness so required.[3] These concepts expanded indemnity beyond its narrow early common law confines, so that, despite their protestations to the contrary, courts were measuring relative degrees of fault among tortfeasors. When a court found a large enough moral disparity, it would shift the whole loss to the most morally culpable party.[4]

Vertecs alleges that the common law would allow indemnity in any situation wherein one tortfeasor's conduct was not as blameworthy as another's and it would be just and fair as between the parties that the entire loss fall upon the indemnitor. Citing to the Restatement (Second) of Torts section 886B and comments thereto,[5] Ver-

---

2. *See* AS 09.16.040(2). Vertecs has not appealed the dismissal of its contribution claim.

3. *See American Motorcycle Ass'n v. Superior Court,* 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899, 909 (Cal.1978); Restatement (Second) of Torts § 886B comment c (1979) and Appendix, Reporter's Note to § 886B (1982); Davis, *Indemnity Between Negligent Tortfeasors: A Proposed Rationale,* 37 Iowa L.Rev. 517, 540 (1952); O'Donnell, *Implied Indemnity in Modern Tort Litigation: The Case for a Public Policy Analysis,* 6 Seton Hall L.Rev. 268, 274 (1975); Comment, *Products Liability—Non-Contractual Indemnity—The Effect of the Active-Passive Negligence Theory in Missouri,* 41 Mo.L.Rev. 382, 387 (1976); Comment, *Indemnity and Third-Party Tort Actions in South Dakota,* 21 S.D.L.Rev. 393, 401 (1976); Note, *Indemnity Among Tortfeasors in New York,* 39 Cornell L.Q. 484, 499 (1954).

4. For source material for the preceding, *see generally American Motorcycle Ass'n v. Superior Court,* 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 889, 908–10 (Cal.1978); W. Prosser,

Law of Torts §§ 50–51 (4th ed. 1971); Comment, 21 S.D.L.Rev. *supra* note 3 at 394–403.

5. Restatement (Second) of Torts § 886B (1979) provides:

*Indemnity Between Tortfeasors*

(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability.

(2) Instances in which indemnity is granted under this principle include the following:

(a) The indemnitee was liable only vicariously for the conduct of the indemnitor;

(b) The indemnitee acted pursuant to directions of the indemnitor and reasonably believed the directions to be lawful;

(c) The indemnitee was induced to act by a misrepresentation on the part of the indemnitor, upon which he justifiably relied;

(d) The indemnitor supplied a defective chattel or performed defective work upon

tecs asserts that the rules summarized there apply in Alaska.[6] Although it recognizes that we have never squarely faced this implied indemnity issue, Vertecs contends that *City & Borough of Juneau v. Alaska Electric Light & Power Co.,* 622 P.2d 954 (Alaska 1981) obliquely approves implied indemnity between concurrently negligent tortfeasors in Alaska.

In *City & Borough of Juneau,* we were required to interpret a contractual indemnity provision. We had to determine whether this provision was merely superfluous or whether it granted the parties rights beyond those that they possessed at common law. In so doing, we noted that:

> Three broad possible fact patterns can arise in the indemnity setting: (1) the indemnitee is sued vicariously for the negligence of the indemnitor, (2) the indemnitee and indemnitor are concurrently negligent but, because there exists a joint and several liability, only one party is sued, or (3) the indemnitee is *solely* negligent and the indemnitor is, by agreement, liable.

*Id.* at 957 (emphasis in original). Vertecs alleges that the second "fact pattern," with its apparent recognition of loss-shifting between concurrently negligent tortfeasors, indicates that this court approves of such loss-shifting on an implied basis. However, a close reading of the case indicates that we

were discussing these three "fact patterns" only in light of a contractual indemnity situation. In order to assess the alleged superfluity of the contract term, we determined that the provision in question granted the City of Juneau a right to seek contribution from Alaska Electric Light and Power, at a time when the common law did not recognize such contribution rights. *Id.* at 958. The clause was thus not superfluous. Therefore, it is clear that we mentioned the second "fact pattern" by way of example to test the superfluity of the contract provision in question, and not by way of recognizing implied indemnity between concurrently negligent tortfeasors.

Vertecs seeks to distinguish *Heritage v. Pioneer Brokerage & Sales, Inc.,* 604 P.2d 1059 (1979), which Reichhold asserts indicates our disapproval of implied indemnity between concurrently negligent tortfeasors. Vertecs asserts that language in *Heritage* which seems to require that an indemnitee be free of personal fault applies only to defense costs, since the only issue before the court in the case dealt with such costs. However, this contention does not withstand examination. In *Heritage,* the trial court's holding that Pioneer Brokerage, a retailer of mobile homes, was entitled to indemnity from Moduline Industries, the manufacturer, was not appealed. Moduline instead appealed the awarding of full attor-

---

land or buildings as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect;

(e) The indemnitor created a dangerous condition of land or chattels as a result of which both were liable to the third person, and the indemnitee innocently or negligently failed to discover the defect;

(f) The indemnitor was under a duty to the indemnitee to protect him against the liability to the third person.

*See id.* comments a, c, & k. Vertecs also cites to applicable sections of the Restatement of Restitution, but these sections are in essence subsumed under the Restatement (Second) of Torts. In response, Reichhold correctly notes that the Restatements are not determinative of the law in Alaska until expressly so adopted. *Sloan v. Atlantic Richfield Co.,* 552 P.2d 157, 160 (Alaska 1976).

**6.** Vertecs cites to AS 01.10.010, which provides:

> So much of the common law not inconsistent with the Constitution of the State of Alaska or the Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this State.

Vertecs argues from this statute that since no statute or constitutional challenge has abrogated the common law of indemnity in Alaska, it must apply as summarized in the Restatement. However, it goes on to admit by implication that this court develops the common law of Alaska, therefore negating this statute's applicability here. Reichhold, on the other hand, contends that to date Alaska has recognized implied indemnity only where the indemnitee has been held vicariously liable, citing *Austin v. Fulton Ins. Co.,* 498 P.2d 702 (Alaska 1972) and *Moses v. McGarvey,* 614 P.2d 1363, 1370 n. 29 (Alaska 1980).

ney's fees to Pioneer from Moduline. *Id.* at 1065. The issue was thus whether, given a duty to indemnify, Moduline also had a duty to defend. We held that "the right to indemnity, ... controls recovery of costs and attorney's fees as a matter of policy." *Id.* at 1066. In so doing, we noted several times that an indemnitee might have to be free of personal fault to receive indemnification.[7] Vertecs asserts that while personal blamelessness may be required for indemnification of defense costs, that does not preclude a fault-bearing tortfeasor from gaining indemnity of liability costs. However, if this were so, the right to indemnity would clearly *not* control the recovery of defense costs, since a blameworthy tortfeasor could obtain indemnity but, under the language of *Heritage,* it could not obtain defense costs. *Id.* at 1067 n. 24; *see* note 7 *supra.* Therefore the *Heritage* lan-

guage relied upon by Reichhold does suggest that a tortfeasor seeking implied indemnification must be free of personal fault.[8]

Even though *Heritage* may be read to indicate our inclination against implied indemnity between concurrently negligent tortfeasors, we have never directly faced this issue before. Therefore, we proceed to examine the positive and negative aspects of such indemnity to determine whether it should be adopted or rejected.

The most fundamental argument in favor of indemnity between two concurrently negligent tortfeasors is that of fairness. Even if two tortfeasors are held jointly and severally liable, often one will pay the entire judgment. If that tortfeasor bears only a minor degree of fault, it is indeed grating to contemplate that it may well

---

**7.** In footnote 20 in *Heritage,* we stated:

> We note, however, that in other factual circumstances cases may exist in which the indemnitee's actual concurrent wrongdoing might preclude it from recovering from an indemnitor. *See, e.g., Insurance Co. of North America v. King,* 340 So.2d 1175 (Fla.App. 1976).

Later in the text of the opinion, we quoted from *Addy v. Bolton,* 183 S.E.2d 708, 710 (S.C. 1971):

> [I]n actions of indemnity, brought where the duty to indemnify is either implied by law or arises under contract, and *no personal fault of the indemnitee has joined in causing the injury,* reasonable attorney's fees incurred in resisting the claim indemnified against may be recovered *as part of the damages and expenses.*

604 P.2d at 1067 (emphasis added). We went on to state in footnote 24, immediately following the language quoted:

> A proviso to this rule, requiring that the party seeking *indemnification* be free from personal negligence in his own dealings with the injured party, is satisfied here.

*Id.* (emphasis added).

**8.** Vertecs argues that *Heritage* actually supports its position that implied indemnity between joint tortfeasors is the law in Alaska. First, it argues that since *Heritage* treated contractual indemnity and implied indemnity identically where recovery of attorney's fees as part of the duty to indemnity was concerned, 604 P.2d at 1066–67, then the remarks in *City & Borough of Juneau* regarding concurrently negligent tortfeasors must be seen as applying to implied indemnity situations. In *Heritage,* the duty to indemnity was given; the question

was whether that included a duty to defend. The court, relying on policy arguments contained in the contractual indemnity case of *Manson-Osberg Co. v. State,* 552 P.2d 654 (Alaska 1976), held that it did. 604 P.2d at 1066–67. In the present case, the question is whether a duty to indemnify exists at all. Merely because *Heritage* states that contractual and implied indemnity should be treated the same once a duty to indemnify exists does not mean that language from a contractual indemnity case may be bootstrapped into *providing a duty to indemnify* in a noncontractual situation.

The second argument, again flowing from *Manson-Osberg* and *Heritage,* is that since in *Manson-Osberg* the entire loss was shifted to a *faultless* tortfeasor, this court should certainly be amenable to shifting the loss to a blameworthy tortfeasor such as Reichhold. However, *Manson-Osberg* involved a contractual indemnity clause, a fundamentally different situation than that presented here.

Finally, since we cited *Insurance Co. of North America v. King,* 340 So.2d 1175 (Fla.App. 1976) in *Heritage, see* note 7 *supra,* Vertecs contends that we thereby implied adoption of the active-passive indemnity theory used in that case. However, the citation to that case was preceded by the signal *"see, e.g.,"* which means that we were merely citing to *INA* as a case illustrative of one in which a concurrently fault-bearing tortfeasor might be precluded from recovering indemnity. The citation thus cannot be transformed into an implicit adoption by this court of the active-passive implied indemnity theory.

shoulder the entire loss while the tortfeasor bearing a large degree of fault suffers none.[9] Indeed, fairness is the reason that before the adoption of contribution common law courts allowed indemnity in cases involving extremely disparate degrees of fault. Courts began shifting entire losses between tortfeasors in such cases because the common law refused to allow contribution between such tortfeasors.

The second positive argument is that shifting the loss from one bearing a minor degree of blame to a greatly more blameworthy tortfeasor is in accord with the tort principle that those at fault should bear the consequences of their defalcations. This is not a perfect fit, because a tortfeasor who bears some fault will pay nothing, but that is only so that the more egregious wrongdoer bears the loss.[10]

Finally, loss-shifting via indemnity may well serve the modern tort goal of shifting losses in a socially desirable fashion so that the loss is most efficiently spread throughout society. If the indemnitor is insured, is a large self-insured business, or is a governmental entity, then the loss may be diffused among the large population of policy-holders, customers, or taxpayers.[11]

On the negative side, the most telling argument is that of vagueness. It is difficult to determine precisely what cases should justify implied indemnity between concurrently negligent tortfeasors. The attempt to manufacture standards for decision and the resulting labels of "active-passive" or "primary-secondary" negligence

left the indemnity jurisprudence of many states in disarray.[12] One state high court noted that this indemnity rule presented

> a trial court with a bewildering array of issues. First, the Court must determine if the negligence of the party was "passive" or "secondary" as opposed to the "active" or "primary" negligence of the other tortfeasor. Next the Court is expected to decide whether the negligence was "concurrent," in which case contribution and not indemnity is awarded. It also must examine "the relative culpability of the conduct of the wrongdoers," but still it must award indemnity on an all-or-nothing basis. Finally, it is admonished that such indemnity cannot be determined by "hard-and-fast rules and must turn on the facts of each case."

*Tolbert v. Gerber Industries, Inc.*, 255 N.W.2d 362, 367 (Minn.1977) (citations and footnotes omitted).

Other commentators have noted that because of this vagueness, the outcome of an attempt to seek indemnity can depend upon how the respective parties' conduct is described.[13] As a result, one negligent defendant will assert a right of indemnity against concurrently negligent co-defendants in every type of case, alleging that its conduct is merely "passive" or "secondary" when compared to that of the co-defendants.[14]

Implied indemnity among fault-bearing tortfeasors is also criticized as not according with the modern tort law goal of each tortfeasor paying for the damages attributable

**9.** Meriam & Thornton, *Indemnity Between Tortfeasors: An Evolving Doctrine in the New York Court of Appeals,* 25 N.Y.U.L.Rev. 845, 858 (1950); Comment, 21 S.D.L.Rev. *supra* note 3 at 401.

**10.** Meriam & Thornton, *supra* note 9 at 858, 860.

**11.** *Id.* at 861.

**12.** *American Motorcycle Ass'n v. Superior Court,* 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899, 909–10 (Cal.1978); *Tolbert v. Gerber Industries, Inc.,* 255 N.W.2d 362, 367 (Minn. 1977); *Dole v. Dow Chemical,* 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288, 291 (N.Y. 1972); W. Prosser, Law of Torts § 51; Meriam

& Thornton, *supra* note 9 at 860; Widland, *Contribution: The End to Active-Passive Indemnity,* 69 Ill.B.J. 78, 79 (1980); Comment, 21 S.D.L.Rev. *supra* note 3 at 401–02. For commentary on the morass in New York before it rejected the active-passive theory in Dole v. Dow Chemical, *see generally* Meriam & Thornton, note 9 *supra.*

**13.** *Davis, supra* note 3 at 541; Le Flar, *Contribution and Indemnity Between Tortfeasors,* 81 U.Pa.L.Rev. 130, 154 (1932); O'Donnell, *supra* note 3 at 274–75.

**14.** Davis, *supra* note 3 at 543; *see* Comment, 21 S.D.L.Rev. *supra* note 3 at 421.

to its tortious acts.[15]  Even if the tortfeasor to whom the loss is entirely shifted is much more at fault than the indemnitee, the indemnitee, who is by definition to some extent at fault, entirely escapes financial responsibility for its tortious act.  No deterrence of the indemnitee's activities occurs.  The *Tolbert* court noted that in such cases indemnity is a "blunt instrument for reallocating responsibility for damages."  255 N.W.2d at 367.[16]

Indemnity among concurrently negligent tortfeasors would also cut against the policy of encouraging settlement.[17]  The Uniform Contribution Act provides that a defendant who settles in good faith may obtain a release from the plaintiff and be insulated from further contribution.  AS 09.16.040(2). The original Uniform Act provided just the opposite, but the present alternative was chosen in an effort to encourage settlement in multi-party cases.  Uniform Contribution Among Tortfeasors Act § 4, Commissioners' Comment, 12 U.L.A. 99–100 (1955). However, that Act also expressly saves from its provisions indemnity rights under existing law.  AS 09.16.010(f).  Therefore, under the indemnity rule suggested by Vertecs, a tortfeasor who was negligent might have no reason to settle, since it still could face potential liability from a concurrently negligent tortfeasor who could convince a trier-of-fact that as between the two tortfeasors, it was so much less at fault that its co-defendant should bear the entire liability.

From the above criticisms can be drawn the conclusion that implied indemnity between concurrently negligent tortfeasors is also judicially inefficient.[18]  With only vague standards to apply, courts must spend time trying to determine whether particular cases fit into the categories allowing indemnity.  Because the standards are so vague, defendants in nearly any tort case will try to shift the loss to other defendants, resulting in time-consuming third-party actions.  More cases would go to trial because defendants would often have no incentive to settle.

In weighing the preceding arguments, we must also keep in mind the presence of contribution.  Contribution, adopted legislatively in Alaska,[19] represents the legislature's considered policy judgment that concurrently negligent tortfeasors should share equally in the loss caused by their tortious acts.  The limited legislative history of the Uniform Contribution Act in Alaska indicates that, despite an amendment proposed by the House Judiciary Committee that would have based contribution on each tortfeasor's relative degree of fault, the legislature eventually chose the equal sharing provisions of the Uniform Act.  1970 House Journal 437–38; see discussion in *Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426, 430–31 (Alaska 1979).[20]  Although pro rata contribution may not in all cases be the most fair method of loss-shifting, it seems more fair than the "blunt instrument" of indemnity where all tortfeasors are to some

15.  Widland, *supra* note 13 at 80.

16.  If, on the other hand, the two blameworthy tortfeasors are left to their remedy under the Uniform Contribution Act, each bears at least some financial responsibility for its acts, even if it settles and is thus protected from further contribution.  This case illustrates this point.  Reichhold has already paid $275,000 and has left itself with a possible continuing liability exposure of another $475,000.  Having settled in good faith, it has no further exposure to liability for contribution under the statute.  But it certainly cannot be said to have escaped responsibility for some of the loss from the fire. It has taken advantage of the provisions of the Uniform Contribution Act that were drafted to stimulate settlement in multi-party cases, Uniform Contribution Among Tortfeasors Act § 4,

Commissioners' Comment, 12 U.L.A. 99–100 (1955).

17.  Widland, *supra* note 13 at 80–81.

18.  *See* Widland, *supra* note 13 at 79–80.

19.  AS 09.16.010–.060.

20.  Vertecs argues that since we apparently rejected allocation of loss among tortfeasors based upon relative degrees of fault in *Arctic Structures,* the only remaining alternative for loss allocation between concurrently negligent tortfeasors is some sort of implied indemnity theory.  However, this contention ignores the presence of the Alaska Uniform Contribution Among Joint Tortfeasors Act.

degree at fault. Further, the indemnity rule advanced by Vertecs arose because the common law did not allow contribution, but that defect has been legislatively cured in Alaska. *See* 1970 House Journal 437. To now adopt implied indemnity between concurrently negligent tortfeasors would be to take a step into the past. Indeed, two distinguished commentators have concluded that once a state adopts contribution, that should be the sole method of non-contractual loss-shifting among concurrently negligent tortfeasors.[21]

Upon considering the preceding arguments, we have concluded that public policy dictates that Alaska should not adopt implied indemnity between concurrently negligent tortfeasors.

II

We must now consider whether summary judgment was the proper disposition of Vertecs' crossclaim. In light of our rejection of implied indemnity between concurrently negligent tortfeasors, summary judgment was clearly appropriate in this case. We have held as a matter of law that in the absence of a contrary contractual provision, one concurrently negligent tortfeasor may not shift its entire loss to another such tortfeasor. Any factual dispute that may exist regarding the relative degrees of culpability of Vertecs and Reichhold is thus irrelevant. Vertecs' crossclaim does not allege any contractual right of indemnity, nor any relationship between itself and Reichhold that would give rise to Vertecs being held vicariously or constructively liable for Reichhold's conduct. Therefore, under the

law of indemnity in Alaska as applied to the pleadings in this case as they existed when summary judgment was granted to Reichhold,[22] summary judgment was correctly granted and must be affirmed.[23]

The judgment is AFFIRMED.

**21.** Keeton, *Contribution and Indemnity Among Tortfeasors,* 27 Ins.Counsel J. 630, 632 (1960); Le Flar, *supra* note 14 at 159.

**22.** We note, however, that Reichhold at oral argument took the position that if the plaintiffs amended their complaint to allege non-fault-based causes of action against Vertecs, Vertecs could again seek indemnity from other defendants, including Reichhold.

**23.** Vertecs also asserts that, even if indemnity is not allowed in this case, its crossclaim contained independent causes of action against Reichhold that were not considered below and

should not have been dismissed. However, a reasonable reading of the crossclaim reveals that its gravamen was indemnity. That being so, the dismissal of these claims was clearly correct in light of our holding today on the indemnity issue. After noticing this appeal, Vertecs attempted to amend its crossclaim but leave to amend was denied. That ruling is the subject of another appeal presently pending before this court and we therefore will not address at this time the appropriateness of any purported independent cause of action that Vertecs might allege against Reichhold.