Richard BENNER, individually, Richard Benner, d/b/a State Leasing and Equipment, and State Leasing and Equipment, Inc., an Alaska corporation, Appellants,

v.

Allen C. WICHMAN, Appellee.

No. S–5023.

Supreme Court of Alaska.

May 27, 1994.

William H. Ingaldson, Maryanne Boreen, Bliss Riordan, Anchorage, for appellants.

Clay A. Young, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for appellee.

Robert C. Bundy, Bogle & Gates, Anchorage, for amicus curiae, Citizens Coalition for Tort Reform.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

Statewide Petroleum (Statewide) is a general contracting company specializing in gas station remodeling and service station maintenance. In 1989, Statewide was awarded a contract to remodel a Texaco station in Anchorage. This job included excavating the station's underground fuel tanks, segregating and examining the excavated dirt for contamination, disposing of the old fuel tanks, installing four new tanks, backfilling, and preparing the site for asphalt and concrete surfacing.

As it had consistently done for at least the five previous years, Statewide subcontracted the excavation work to B–C Excavating (B–C). B–C was responsible for removing used fuel tanks, excavating a tank hole, and assisting in the installation of the new tanks. Allen Wichman operates backhoes for B–C. Because it did not have any cranes or qualified crane operators, B–C contracted with State Leasing & Equipment, Inc. (State Leasing) to provide a crane and operator. Richard Benner, the president of State Leasing, operated the crane during the course of the Texaco job.

On July 25, 1989, Benner and Wichman were working in tandem, installing new tanks. The job required close coordination between laborers in the pits who were setting and leveling the tanks, Wichman on the

backhoe, and Benner on the crane. Wichman would fill a bucket with pea gravel and Benner would lift the bucket with the crane and dump it into the pit where the laborers would pack gravel around the tanks to hold them in place. Space was limited at the site, and all parties were aware of the existence of power and telephone lines in the work area. Benner relied on an on-site signaler for directions to lift and set the tanks in the hole and to avoid the laborers when swinging his load. However, Benner had no designated spotter. Benner knew that he was required to have a spotter,[1] though he did not discuss that requirement with anyone else at the site.

Eventually, Wichman got out of his backhoe to inform the dump truck operators where to unload more gravel, and Benner set his bucket down away from the excavation pit and closer to the powerlines. On returning to his backhoe, Wichman grabbed the bucket attached to the crane and received a severe electrical shock. He sustained a variety of injuries.

Wichman received workers' compensation benefits from his employer, B–C. He subsequently filed a complaint against Benner and State Leasing (collectively "Benner") alleging that Benner's negligence caused Wichman's injuries. Benner responded that Wichman's damages were caused, in whole or in part, by Wichman's own acts or the acts of third parties not under the defendant's control, since Wichman was working under and aware of the energized overhead lines.

Benner thereafter moved for summary judgment, arguing that Wichman's claims were barred by the exclusive remedy provision of AS 23.30.055, based on his assertion that he and Wichman were co-employees of B–C. Wichman opposed the motion, and moved for partial summary judgment in his favor on the issue. The superior court denied Benner's motion and granted Wichman's motion, holding that Benner was an independent contractor.

Benner requested that the superior court instruct the jury that it could apportion fault to Wichman, and to entities who were not parties to the suit.[2] The superior court instructed the jury that Benner was negligent as a matter of law, and did not require it to apportion fault among non-parties to the litigation.[3] The jury awarded Wichman $65,000. On appeal Benner challenges the superior court's rulings that (1) Wichman's recovery was not barred by the exclusive remedy provision in AS 23.30.055, (2) as a matter of law Wichman was not comparatively negligent, and (3) fault would not be apportioned among non-parties.[4]

1. The Alaska Construction Code in effect at the time of the accident required that a crane have a safety spotter when working near energized electrical distribution and transmission lines. AAC 05.140(a)(1)(O), (a)(2)(D)–(a)(2)(G) (1990).

 Although Benner points out that Wichman knew that crane operators were prohibited from operating within ten feet of power lines, he does not allege that Wichman was aware of the spotter requirement.

2. Benner's proposed Jury Instruction No. 21 read:

 Under Alaska law, a party is only responsible for the portion of damages equaled [sic] to that party's percentage of fault.
 The defendants claim that the plaintiff's harm resulted, in whole or in part, from the plaintiff's own negligence and/or the negligence of others, not parties to this litigation such as BC Excavating and Statewide Petroleum.
 In order to assess fault to the plaintiff and/or others, you must decide that it is more likely true than not true:

 1. that the plaintiff and/or others were negligent, and
 2. that such negligence was a legal cause of plaintiff's harm.

3. The superior court told the jury:
 You are instructed that as a matter of law the defendants, Richard Benner and State Leasing & Equipment, Incorporated, were negligent and that their negligence was a legal cause of at least some of the plaintiff's damages. Therefore, the only issue remaining for you to decide is the amount of plaintiff's damages that were legally caused by defendants' negligence in accordance with the rest of these instructions.

4. Although Benner's statement of points on appeal and his brief's statement of issues presented on cross-appeal allege that the superior court erred in ruling that Benner was negligent as a matter of law, his brief does not dispute his own negligence. His reply brief, in fact, states that "the fact of [Benner's] negligence is not the point." Because of this, and because Benner admitted his own negligence at trial, we will not disturb that ruling.

## I. THE SUPERIOR COURT DID NOT ERR IN DETERMINING THAT WICHMAN'S CLAIMS WERE NOT BARRED BY THE EXCLUSIVE REMEDY PROVISION IN AS 23.30.055

Workers' compensation is the exclusive remedy for injuries caused by an employee to "any fellow employee." AS 23.30.055. The statute does not define "employee."[5] Benner argues that he and Wichman were co-employees of B–C, and therefore a judgment against Benner in tort was improper. The superior court concluded that Benner was a subcontractor, and not an employee.

■ As both parties note, Alaska has adopted the "relative nature of the work" test for determining when a person is another's employee. *See Searfus v. Northern Gas Co.*, 472 P.2d 966, 969 (Alaska 1970); *see also* 8 Alaska Administrative Code 45.890 (1991). The test has two parts: "first, the character of the claimant's work or business; and second, the relationship of the claimant's work or business to the purported employer's business." *Ostrem v. Alaska Workmen's Compensation Bd.*, 511 P.2d 1061, 1063 (Alaska 1973).

### A. Character of the Business

■ The character of claimant's work or business has three factors: "(a) the degree of skill involved; (b) the degree to which it is a separate calling or business; and (c) the extent to which it can be expected to carry its own accident burden." *Id.*

### 1. Degree of Skill Involved

Crane operation is a skill that requires specialization. For example, union crane operators attend a school at which they learn the skills they need. B–C hired Benner, in part, because it had no qualified crane opera-

tors. At the time of trial Benner had somewhere between twenty-two and twenty-five years of experience operating cranes. Although Benner has had no formal training in crane operation, he has done considerable reading to supplement his first-hand experience.

### 2. Separate Business

■ This is one of the most important factors in determining whether someone is an employee or an independent contractor: "If the worker does not hold himself out to the public as performing an independent business service, and regularly devotes all or most of his independent time to the particular employer, he is probably an employee, regardless of other factors." 1 Arthur Larson, *Larson's Workmen's Compensation* § 45.31 (desk ed.1993).

Benner characterized himself as the owner/operator of his own business rather than as a dispatch employee. He is the president and sole shareholder of State Leasing, a business that owns five cranes and provides services. State Leasing has two business licenses and a variable number of employees, and was incorporated twenty years ago. It is a separate business from B–C.

### 3. Accident Burden

This factor also favors a determination that Benner was an independent contractor.[6] The best evidence that State Leasing was able to carry its own accident burden is that it in fact did so. At the time of the accident, it had $500,000 in liability coverage. At various times during the life of the corporation, State Leasing also had excess liability coverage. State Leasing also carried worker's compensation insurance.

---

5. *See* AS 23.30.265(12) (" 'employee' means an employee employed by an employer as defined in (13) of this section"); 23.30.265(13) (" 'employer' means ... a person employing one or more persons in connection with a business or industry coming within the scope of this chapter and carried on in this state").

6. While acknowledging that this factor is on Wichman's side, Benner attempts to discount it by arguing that making this factor dispositive

would encourage general contractors to require self-insurance by those they hire. We find this argument unpersuasive. First, we are not treating the accident-burden factor as dispositive, only significant. Second, Benner's suggestion that we should not consider it at all flatly contradicts settled case law. Third, Benner has not demonstrated that greater self-insurance by subcontractors would be undesirable.

B. *Relationship of Benner's Work to B–C's Business*

This factor can also be subdivided:

The relationship of the claimant's work or business to the purported employer's business requires consideration of: (a) the extent to which claimant's work is a regular part of the employer's regular work; (b) whether claimant's work is continuous or intermittent; and (c) whether the duration is sufficient to amount to the hiring of continuing services as distinguished from contracting for the completion of the particular job.

*Ostrem,* 511 P.2d at 1063.

1. *Relationship Between Benner's Work and B–C's Work*

According to Gordon Bartel, superintendent of B–C, crane use was a "regular part of the job of removing and setting new tanks." Although B–C and State Leasing worked together frequently, State Leasing was not working exclusively for B–C in general or at the time of this job. State Leasing's account ledger for B–C indicates that B–C hired Benner a number of times during 1989 and 1990, though the engagement does not appear to have been continuous; in particular, the account reflects almost no activity between December 1988 and July 1989. B–C usually hired State Leasing when it needed a crane, but not always.[7]

To the best of Benner's recollection, State Leasing had two other employees around the time of the B–C job, and they were working on a different job, although one of them may have been "on call" at the precise time of the B–C job.

2. *Whether the Work Was Continuous or Intermittent*

Benner's work took eleven hours to complete. Although an accurate statement of the duration of the larger B–C job appears to

be unavailable, the job lasted at least a number of days and possibly several weeks. The work was intermittent.

3. *Duration*

Benner was hired for the completion of a particular job. B–C had the option of terminating Benner at any time, paying him only for the hours he·had worked.[8] He was, however, hired frequently.

C. *Summary*

■ B–C and State Leasing were legally and functionally distinct entities. The bulk of the factors in the "relative nature of the work" test support a determination that State Leasing was not B–C's employee. The superior court was correct in ruling that AS 23.30.055 did not immunize Benner from liability.

II. *THE SUPERIOR COURT ERRED IN DIRECTING A VERDICT AS TO WICHMAN'S COMPARATIVE NEGLIGENCE*

■ After hearing argument from both parties on whether to direct a verdict on Wichman's comparative negligence, the superior court ruled that it would instruct the jury that Wichman was not negligent. The superior court then instructed the jury to consider only Benner's negligence. Benner now argues that the superior court's ruling that Wichman was not comparatively negligent, as a matter of law, was reversible error. On review of a motion for a directed verdict, we do not weigh conflicting evidence or judge the credibility of the witnesses. Rather, we determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable people could not differ in their judgment. *Petersen v. Mutual Life Ins. Co.,* 803 P.2d 406, 410 (Alaska 1990).

---

7. Robert M. Haines, the owner of B–C, testified that he hired other companies "when Dick [Benner] wasn't available or something." This statement first shows that B–C did not always hire State Leasing. Haines's statement next shows that State Leasing was sometimes unavailable to B–C, indicating that State Leasing did not owe exclusive allegiance to B–C.

8. Wichman's brief states that hiring a crane subcontractor "was not a feature on every job." Nothing on the pages cited indicates how frequently B–C needed cranes on its jobs, or what percentage of its jobs involved gas tank removal.

Benner admitted at trial that when the accident occurred he was knowingly operating his crane in violation of two statutory provisions. His crane came within ten feet of a power line,[9] and he did not have a safety spotter. In support of his contention that Wichman was comparatively negligent, Benner advanced three theories before the superior court.

First, Benner argued that Wichman "was the one in charge," and had supervisory responsibility. Wichman was "negligent in his direction and control of the work site as basically the foreman." Second, he argued, there was an informal system of mutual reliance at the site, in which all involved were responsible for avoiding accidents. Benner's third theory of comparative negligence was that Wichman acted negligently when he grabbed for the bucket unconsciously, given that there were power lines around. As Wichman correctly notes, this third theory appears to have been abandoned on appeal.

We find Benner's first theory unpersuasive. Although Wichman was an experienced equipment operator, his experience was primarily with backhoes. Wichman's main responsibility on the Texaco job was to operate the backhoe and scoop gravel.

Wichman did have some supervisory responsibility at the site, but that responsibility was limited to the gravel trucks.[10] Despite Benner's assertion before the superior court that Wichman was "basically the foreman," the undisputed testimony established that Wichman was not designated as the foreperson, that he did not de factor perform that role, and that there were other individuals at the site who had and exercised supervisory authority over the whole project.[11]

The second theory has greater merit. There was testimony that although workers at the site were performing different tasks, the tasks were interdependent, and the workers relied on each other to a large extent. Workers at the site were aware of power lines. Wichman specifically was aware of them and concerned about them. Benner testified that he could not see from inside the crane how close the crane was to the power lines. He testified further that he relied on the others with whom he worked to warn him if he strayed too close to the lines, and that there was an understanding to that effect. He testified that he specifically relied on Wichman, though he admitted there was no explicit request or agreement, and subsequently characterized his belief that Wichman would monitor the crane's position as "maybe an assumption." Benner himself took no steps to ensure that the crane stayed away from the power line. A jury might find that his reliance was unreasonable,[12] but it is

---

9. Alaska Statute 18.60.670 reads:
 A person individually or through an agent or employee may not
 (1) place any type of tool, equipment, machinery, or material that is capable of lateral, vertical, or swinging motion, within 10 feet of a high voltage overhead electrical line or conductor;
 (2) store, operate, erect, maintain, move, or transport tools, machinery, equipment, supplies, materials, apparatus, buildings, or other structures within 10 feet of a high voltage overhead electrical line or conductor.
 Violations of this provision may be reckless or knowing. *Cole v. State*, 828 P.2d 175, 178–79 (Alaska App.1992). We interpreted this provision most recently in *Homer Electric Ass'n v. Towsley*, 841 P.2d 1042, 1044–47 (Alaska 1992), where we held that moving a crane to a position in which a part of it could come within ten feet of a power line does not constitute a violation unless the equipment in fact comes within that range.

10. One worker testified that Wichman was "running the job there," but, in context, this testimo-

ny appears to refer only to the gravel transport aspect of the operation.

11. Gordon Leonard, the owner of Statewide, claimed that he was responsible for overseeing safety at the site when he was present. When he was not present, Robert Haines, the owner of B–C, would be responsible for safety, or Haines's foreperson if neither Leonard nor Haines was present. Leonard was present at the site the day of the accident.

12. Many facts might lead a jury to question the reasonableness of Benner's reliance on Wichman. Wichman had never worked with a crane in this kind of operation before. He had never worked as a crane spotter, nor had he ever operated a crane. Moreover, Leonard was giving Benner visual directions indicating where to drop the bucket's load. Benner testified that when other workers tried to direct him, he would indicate visually that Leonard alone should direct. The only testimony that explicitly discussed the reasonableness of Benner's reliance on Wichman came from Richard Kurkowski, an assistant

difficult to say as a matter of law that the workers did not assume some responsibility for assisting each other in maintaining safety at the site.[13]

Another theory of Wichman's duty is implicit in Benner's brief, and is essentially a variant on the second theory. Whereas the second theory suggests that Wichman was negligent for not warning Benner that the crane was moving too close to the power line (or for unthinkingly reaching for the bucket), this theory argues that Wichman caused the crane to move closer to the line.

■ Drawing all inferences in Benner's favor, we conclude that reasonable jurors could differ as to whether Wichman was comparatively negligent. Benner and Wichman initially discussed the location of the crane, and Wichman rejected the first location Benner proposed, which was farther away from the line than the location they ultimately agreed upon. The crane started out 18–20 feet from the power lines. It moved two feet closer early on at Leonard's request.[14] Benner also testified that he followed Wichman's bucket, which Wichman progressively moved closer to the line, and Benner assumed Wichman was monitoring the safety of the situation. We hold that the superior court erred in granting a directed verdict on Wichman's comparative negligence.

## III. THE SUPERIOR COURT DID NOT ERR IN REFUSING TO ALLOW THE JURY TO CONSIDER THE FAULT OF NON–LITIGANTS

Benner argues that the superior court should have given his proposed instruction allowing the jury to apportion liability among anyone responsible, including those not party to the action. He bases this contention on the "Tort Reform Ballot Initiative" (initiative) approved by Alaskan voters on November 8, 1988. The initiative amended AS 09.-17.080(d) to read, "[T]he court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault."[15] The initiative also repealed AS 09.16.010, which provided for a right to contribution among tortfeasors. According to Benner, the superior court should have allowed the jury to reduce his percentage of fault by the percentage of fault attributable to Statewide and B–C, which are not parties to this action. While acknowledging that he could have joined them and chose not to, Benner maintains that under the statutory scheme joinder is not necessary.

chief for the Alaska Department of Labor, who stated that it is unreasonable for a crane operator to rely on a person who is unfamiliar with crane signals, and with whom the crane operator has no explicit agreement, for spotting.

13. There was also testimony that Benner was experienced, and that job supervisors therefore did not watch him closely to ensure he was performing his job safely.

14. This was so that the hole would not cave in; Benner believed the move to be sensible.

15. Alaska Statute 09.17.080, as amended by the initiative, states:
(a) In all actions involving fault of more than one party to the action, including third-party defendants and persons who have been released under AS 09.16.040, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating
(1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
(2) the percentage of the total fault of all of the parties to each claim that is allocated to

each claimant, defendant, third-party defendant, and person who has been released from liability under AS 09.16.040.
(b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault, and the extent of the causal relation between the conduct and the damages claimed. The trier of fact may determine that two or more persons are to be treated as a single party if their conduct was a cause of the damages claimed and the separate act or omission of each person cannot be distinguished.
(c) The court shall determine the award of damages to each claimant in accordance with the findings, subject to a reduction under AS 09.16.040, and enter judgment against each party liable. The court also shall determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault.
(d) The court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault.

■ As to B–C, the premise of this argument is wrong because "as a result of the exclusive liability provision (of the workers' compensation law, AS 23.30.055) an employer may be joined as a third-party defendant only when another party asserts an express indemnity claim against it." *Lake v. Construction Machinery, Inc.*, 787 P.2d 1027, 1030 (Alaska 1990). Benner does not purport to have a claim for contractual indemnity against B–C and therefore could not have joined B–C.

■ As to Statewide, resolution of this issue turns on the interpretation of "party," within the meaning of AS 09.17.080(d). As another court noted when interpreting a similar statute,[16] we may construe the term "party" to mean: (1) persons involved in an accident; (2) defendants in a lawsuit; or (3) all litigants in a lawsuit. *Fabre v. Marin*, 623 So.2d 1182, 1184 (Fla.1993).

After the initiative became effective, one superior court observed that "since contribution no longer exists and since the Supreme Court has rejected equitable indemnity, the defendants can not bring in persons who share in the responsibility for the injury." *Owens v. Robbins*, No. 1SI–90–354 Ci., at 2–3 (Alaska Super., Sept. 27, 1991). Therefore, according to *Owens*, if defendants cannot bring in other tortfeasors and the fault of these non-parties to the action cannot be considered, a "deep pocket" defendant could be liable for 100% of the damages, no matter how small its percentage of fault. *Id.*

■ On the equitable indemnity issue, we disagree with *Owens*, and agree with the contrary holding in *Dunaway v. The Alaska Village, Inc.*, No. 3AN–90–3526 Ci. (Alaska Super., July 25, 1991), and *Robinson v. U-Haul Co.*, 785 F.Supp. 1378, 1380–81 (D.Alaska 1992). We had rejected equitable indemnity in *Vertecs v. Reichhold Chemicals, Inc.*, 661 P.2d 619 (Alaska 1983). Our holding in

*Vertecs*, however, was that equitable indemnity was undesirable given the availability of contribution. *See id.* at 625–26. Now that the voters have eliminated contribution through the initiative, equity requires that defendants have an avenue for bringing in others who may be liable to the plaintiff.

A recent United States District Court opinion on this question reads "parties" to include all persons whose negligence contributed to the plaintiff's injuries. *Carriere v. Cominco Alaska, Inc.*, 823 F.Supp. 680, 687 (D.Alaska 1993). Whereas *Owens* relied on our past rejection of equitable indemnity, *Carriere* considered and rejected the prospect of our revising our position on equitable indemnity in light of the initiative. *Carriere* assumed that our position on equitable indemnity was unlikely to change, because it concluded that equitable indemnity was incompatible with the elimination of equitable contribution:

> [Allowing equitable indemnity as a means of joining defendants] presumes that the Alaska Supreme Court would in substance veto the 1987 initiative. It supposes that the court can construct an implied cause of action for indemnity even though the voters had eliminated a tortfeasor's ability to hold another tortfeasor responsible through the repeal of the statutory provision for contribution.

*Id.* at 688.

■ We believe that *Carriere* overstates the initiative's scope. The initiative did away with one category of claims—contribution. It did not purport to abolish all claims between defendants and potential third-party defendants. For example, despite our rejection of equitable indemnity in *Vertecs*, we certainly did not reject contractual indemnity. Nor does the initiative prevent courts from vindicating duties that nonlitigants owe plaintiffs by authorizing joinder of those nonlitigants.[17] In the absence of contribution,

---

16. At issue in that case was Florida's comparative fault law, which states:

> Apportionment of damages.—In cases to which this section applies, *the court shall enter judgment against each party liable on the basis of such party's percentage of fault* and not on the basis of the doctrine of joint and several liability. . . .

Fla.Stat.Ann. § 768.81(3) (West 1993) (emphasis added).

17. Because what is involved in cases like this one is not a third party's duty to pay the defendant, but the third party's duty to pay the plaintiff, we prefer the term "equitable apportionment." *See Robinson*, 785 F.Supp. at 1381 n. 4. Also for

we hold that equitable apportionment is available as a means of bringing other tortfeasors into the action.

The Florida Supreme Court interpreted its comparative fault statute differently:

> By its clear terms, judgment should be entered against each party liable on the basis of that party's fault.... Clearly, the only means of determining a party's percentage of fault is to compare that party's percentage to all of the other entities who contributed to the accident, regardless of whether they have been or could have been joined as defendants.
>
> Even if it could be said that the statute is ambiguous, we believe that the legislature intended that damages be apportioned among all participants to the accident.... Not only would [a contrary] result contradict the specific statutory language ... but also it defies common sense....

*Fabre*, 623 So.2d at 1185–86. The court therefore upheld the superior court's holding that the fault of an entity that was a party to the accident but not the action should be considered in computing the defendant's fault. *Id.* at 1184, 1187.

 Were we considering only AS 09.17.080(d), we might agree with *Fabre*.

However, the statute in *Fabre* differs from AS 09.17.080 in that the Florida statute does not define the term "party." *Id.* at 1184. Whenever possible, we construe each part or section of a statute with every other part or section, to produce a harmonious whole. *Forest v. Safeway Stores, Inc.*, 830 P.2d 778, 781 (Alaska 1992). It is a general principle of statutory construction that "the same words used twice in the same act have the same meaning." 2A Norman J. Singer, *Sutherland's Statutes and Statutory Construction* § 46.06 (5th ed. 1992); *accord Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 725 (9th Cir.1978). "Where the meaning of a word is unclear in one part of a statute but clear in another part, the clear meaning can be imparted to the unclear usage on the assumption that it means the same thing throughout the statute." 2A Singer, *supra*, § 47.16; *see also O'Callaghan v. State*, 826 P.2d 1132, 1134 (Alaska), *cert. denied*, —— U.S. ——, 113 S.Ct. 176, 121 L.Ed.2d 122 (1992) (uniform usage of term in statute creates a strong presumption that it has the same meaning where ambiguous).

In AS 09.17.080(a) "party" is defined as a "party to the action, including third-party defendants and persons who have been released under AS 09.16.040." [18] Furthermore,

---

this reason, Alaska Civil Rule 14(a) may be an inadequate basis for defendants to bring in additional potentially liable parties. Defendants may be able to rely on Alaska Civil Rule 13(h), which authorizes joinder of additional parties for crossclaims, and Alaska Civil Rule 20(a).

Civil Rule 20(a) states in part:
All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all of them will arise in the action.
This situation is, of course, somewhat unusual in that a defendant would be asserting that the plaintiff has a right to relief against the third-party defendant. Undeniably, the new statutory scheme is problematic, given our current civil rules. We are therefore requesting our Standing Advisory Committee on Civil Rules to consider this problem.

18. Under former AS 09.16.040, a release or covenant not to sue or enforce judgments does not discharge any of the other tortfeasors from liability ... but it reduces the claim against the

others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater....
Like the rest of former chapter 16, which governed contribution, section .040 was repealed by the initiative. Repealed statutes relating to the same subject matter may be *in pari materia, see* 2A Singer, *supra*, § 51.04, and therefore may be construed together. *Cf. Carter v. Brodrick*, 644 P.2d 850, 855 (Alaska 1982) (*in pari materia* statutes may be construed together).
In this case, AS 09.16.040 is integral to the definition of "party" in AS 09.17.080(a). Although AS 09.16.040 has been repealed, we are not prevented from examining it in interpreting AS 09.17.080(a), where nothing in amended AS 09.17.080 suggests an intent to alter the provision's applicability to settling parties.
Furthermore, statutes should be given a "reasonable and practical interpretation in accordance with common sense." *O'Callaghan*, 826 P.2d at 1136. Consequently, the definition of "party" in AS 09.17.080(a) encompasses settling and released parties. Any other interpretation would be contrary to reason and good sense.

under AS 09.17.080(a)(2) "the percentage of the total fault of all of the parties to each claim [ ] is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under AS 09.16.040." [19]

■ Based upon the above canons of construction, we interpret "party" as used in AS 09.17.080(d) in the same way. We hold that "party" for purposes of AS 09.17.080(d) means parties to an action, including third-party defendants and settling parties, and that the superior court did not err in refusing to allow the jury to consider the negligence of Statewide and B–C, since they were not parties within this definition.

Benner also raises equal protection and due process objections to the superior court's ruling. The equal protection argument was not raised below, and is therefore waived. *See Williams v. Alyeska Pipeline Serv. Co.,* 650 P.2d 343 (Alaska 1982). The due process argument assumes a defendant cannot bring in other potentially liable parties. This, for reasons stated above, is a false assumption.

## IV. CONCLUSION

The judgment of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

MOORE, C.J., and BURKE, J., not participating.

---

[19]. Alaska Statute 09.17.080 is substantially similar to the Uniform Comparative Fault Act, except that the initiative amended it to provide for several, rather than joint and several liability. The Comment to the Uniform Comparative Fault Act explicitly addresses this situation:

*The limitation to parties to the action means ignoring other persons who may have been at fault with regard to the particular injury but who have not been joined as parties.* This is a deliberate decision. It cannot be told with certainty whether that person was actually at fault or what amount of fault should be attributed to him, or whether he will ever be sued, or whether the statute of limitations will run

on him, etc. An attempt to settle these matters in a suit to which he is not a party would not be binding on him. Both plaintiff and defendants will have significant incentive for joining available defendants who may be liable. The more parties joined whose fault contributed to the injury, the smaller the percentage of fault allocated to each of the other parties, whether plaintiff or defendant.

Unif. Comparative Fault Act § 2 cmt., 12 U.L.A. 50 (Supp.1993) (emphasis added). This reinforces the plain language of AS 09.17.080, and supports our rejection of Benner's broader definition of "party."