154 P.3d 1014 (2007)
PETROLANE INCORPORATED d/b/a Petrolane Gas, Soldotna, Alaska, Appellant,
v.
Gary E. ROBLES, Appellee.
No. S-11042.
Supreme Court of Alaska.
March 23, 2007.
*1016 L.G. Berry, Robertson, Monagle & Eastaugh, Anchorage, for Appellant.
Laurel J. Peterson, Law Office of Laurel J. Peterson, Anchorage, for Appellee.
Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

OPINION
CARPENETI, Justice.
I. INTRODUCTION
Is a non-settling defendant tortfeasor entitled to offset against his liability to the plaintiff the amount of a settlement between the plaintiff and a settling defendant? We conclude that under a pure several liability regime such as ours the non-settling defendant is entitled to an offset only to the extent of the settling defendant's share of the damages.
A jury found Petrolane Incorporated and Gary Robles, but not Shoreside Petroleum, liable for a propane tank explosion that severely injured Robles and Robert Gannaway. We remanded for a new trial on whether Shoreside could have been liable under a negligence theory excluded by the trial court. The remand required reconsideration of the comparative fault of all of the parties, but maintained the first jury's findings as to Petrolane, Robles, and Gannaway. Before the first trial, Gannaway and Petrolane had settled: In return for a cash payment from Petrolane, Gannaway assigned to Petrolane ninety percent of any award he might obtain from Robles. After the second trial, the superior court reduced Robles's liability to Gannaway by the full settlement amount. Because under a several liability regime such as ours Robles is entitled to an offset only to the extent of Petrolane's share of the damages, we reverse on this issue. Petrolane also appeals the second trial court's decision to instruct the jury that Petrolane and Robles must be at least one percent liable. *1017 Because we find no error in this instruction, we affirm on this issue.
II. FACTS AND PROCEEDINGS
The factual background of this case was set out in our opinion in Robles v. Shoreside Petroleum, Inc.[1] In brief, Gary Robles and his customer Robert Gannaway were injured in October 1993 when Gannaway's old and corroded propane tank that Robles was filling exploded at the Tesoro station leased and operated by Robles. Gannaway sued Robles, Shoreside Petroleum, Inc., the propane supplier, and Petrolane Incorporated, Shoreside's wholesale propane distributor; Robles sued Shoreside and Petrolane. Before the first trial, Petrolane and Shoreside settled with Gannaway, paying him $400,000 in exchange for releasing both companies from all claims and assigning them ninety percent of his claims against Robles.
The first jury found Petrolane and Robles equally negligent in causing the accident and allocated half the liability for the accident to each, and the superior court entered judgment accordingly: Petrolane and Robles were each liable for fifty percent of Gannaway's damages of $358,379.73 and Petrolane was liable to Robles for half of his damages of $871,216.19. Superior Court Judge Michael Wolverton's judgment incorporated Gannaway's pre-trial settlement, offsetting Robles's award against Petrolane by Gannaway's award against Robles, and ordering Petrolane to pay Robles the difference.[2]
We reversed and remanded for "retrial on the issue of Shoreside's negligent failure to warn and on the related issues of causation and comparative fault,"[3] but noted that there was "no reason to disturb the jury's determination on the issue of overall damages."[4] This outcome also made it unnecessary for us to address the superior court's incorporation of the Gannaway settlement into the final judgment.[5]
Before the second trial, Petrolane and Shoreside renewed their argument that their settlement with Gannaway made them assignees of his claims, and that they accordingly were entitled to reduce the amount of damages they owed Robles by the amount Robles was liable to Gannaway. Robles in turn asserted that he was entitled to reduce his liability to Gannaway by the amount Gannaway received from the other defendants in his settlementmeaning he effectively owed no damages to Gannaway. Superior Court Judge Eric Sanders, to whom the case was assigned on remand, interpreted language from our decision in Universal Motors, Inc. v. Neary[6] as requiring prior settlements to reduce a plaintiff's trial verdict by the full amount of the settlements rather than reducing it by the percentage of fault attributed to settling tortfeasors. Judge Sanders, considering the outcome "unfair," reluctantly concluded that Neary compelled him "to agree with Robles's position, even if the decision would, in all likelihood, be reversed."
Judge Sanders informed the second jury in Instruction No. 7 of the first jury's determinations that both Petrolane and Robles were negligent, that their negligence was a cause of the harm, and that Shoreside negligently trained Robles. The jury was told the court (as opposed to another jury) had made these determinations and was instructed not to reexamine these issues or discuss why the court decided them.
While the second jury concluded that Shoreside, Petrolane, and Robles were all negligent, it found that only Petrolane and Robles's negligence was a legal cause of the harm. The jury attributed 56.25% of the responsibility to Robles, and 43.75% of the responsibility to Petrolane.
Petrolane appeals the superior court's decision that full offset was required and the superior court's Instruction No. 7.
*1018 III. STANDARD OF REVIEW
We review questions of law and a trial court's application of law to fact de novo, adopting the rule of law most persuasive in light of precedent, reason, and policy.[7] We also review de novo jury instructions to which timely objection was made.[8]
IV. DISCUSSION
A. The Superior Court Erred in Applying a Full Offset.
Petrolane's first argument on appeal is that the superior court erred in ruling that under AS 09.17.080(d) the pre-trial settlement between Gannaway, Shoreside, and Petrolane extinguished Robles's obligation to pay his proportion of Gannaway's damages to Petrolane following the second trial. Alaska Statute 09.17.080(d) states: "The court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault."[9]
1. Robles is entitled to a proportionate share offset for Petrolane's settlement with Gannaway.
Upon remand, Judge Sanders raised the issue of whether "Petrolane and Shoreside, having received an assignment from Robert Gannaway for money Gary Robles owes him, are entitled to a credit for what they may be required to pay Robles as a result of this court's eventual judgment."[10] The court concluded "that Robles owes nothing for Gannaway's damages despite a jury finding of fault against Robles," because our Neary decision "supports Robles's argument that he is entitled to offset amounts Gannaway received from other defendants." The court noted that this result was "inconsistent with the principles behind Alaska's several liability statute," but believed that Neary required this outcome.
Petrolane offers five reasons why the superior court's holding was erroneous, arguing that (1) the superior court's decision is based only on "Neary dicta," and that, as the superior court suggested, Neary was distinguishable because it involved the threat of "double recovery" in multiple lawsuits; (2) the superior court's decision contradicts the plain language of AS 09.17.080(d); (3) the decision runs against case law in other jurisdictions and the "near-universal rule that [full] credit [is] inapplicable in jurisdictions in which joint-and-several liability ha[s] been modified or abolished;" (4) the voters have indicated a clear preference for individual defendants to be liable for their proportion of fault; and (5) allowing non-settling tortfeasors to "receive the benefit of a favorable settlement negotiated by the plaintiff' creates "a strong disincentive to settle cases."
Robles replies that past cases, including Neary, require that "payment received by a plaintiff must be deducted by the damages recoverable" from other tortfeasors so that plaintiffs may not collect more than the jury's final determination of their damages. However, the nature of an offset for a prior *1019 settlement under this version of subsection .080(d) is a question of first impression, and Robles fails to squarely address whether full offsets are appropriate under pure several liability. As explained below, we agree with Petrolane and adopt the proportionate share approach for offsets of prior settlements in single-suit, multi-defendant cases.
Over time Alaska has moved from a tort regime premised on joint and several liability, where a marginally liable defendant could end up paying for the entire harm, towards a system focused on linking a defendant's liability to that defendant's comparative share of the harm. As we have noted:
[A]t common law, and in Alaska before 1970, joint tortfeasors were jointly and severally liable and did not have a right of contribution against each other. The legislature granted joint tortfeasors the right of contribution in 1970 by enacting the Alaska Uniform Contribution Among Tortfeasors Act. That act explicitly precluded intentional tortfeasors from seeking contribution. Tort reform legislation in 1986 amended the contribution act, and required that the liability of joint tortfeasors be determined by each tortfeasor's percentage of fault.[[11]]
The 1986 legislation was in turn amended in 1988 when the voters passed the "Tort Reform Ballot Initiative" (initiative), which moved Alaska from modified joint and several liability to pure several liability.[12] The initiative amended AS 09.17.080(d) such that "each party [would be] liable only for damages equal to his or her share of fault" and repealed statutory sections concerning contribution between tortfeasors.[13] The initiative was designed to "ensur[e] that people are held accountable for injuries or damages they cause," and thus continued the general trend towards increasing emphasis on comparative fault.[14]
Granting Robles a full offset that would eliminate his liability would require us to ignore the development of our law and the central purpose of the initiative. The voters did not intend for tortfeasors like Robles, who have been found liable for a portion of a plaintiff's harm, to escape paying for their share of the harm because of another defendant's settlement with the plaintiff. As the statement in support of the initiative noted, "[i]f Ballot Measure 2 is passed and you do something wrong, you pay for it."[15] Because allowing Robles a full offset would run counter to the intent behind the initiative, we reject his argument.
Robles cites Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin[16] and Navistar International Transp. Corp. v. Pleasant[17] for the proposition that "a [defendant] is entitled to offset the amount of any settlement against the jury verdict in order to avoid double recovery, and consideration received [in a settlement agreement] operates as payment `pro tanto' upon any judgment obtained against [other tortfeasors]." He argues that these cases were decided on the basis of our opposition to "double recovery." However, these cases are distinguishable: Bohna and Navistar were decided under joint and several liability regimes that included statutory provisions requiring full offset.[18] Moreover, the rule against double recovery is *1020 grounded in joint and several liability. In that context, the plaintiff has "overlapping remedies," which is to say that he or she can be compensated by any liable defendant, and the rule is necessary to ensure that such "overlapping remedies . . . must not become multiple remedies."[19] But since the pure several liability regime enacted by initiative in 1988 repealed the express availability of full offsets and because a defendant's liability under the 1988 law was limited by comparative fault, there is no reason to allow a non-settling defendant full offset under the 1988 law. As the Texas Supreme Court noted:
[Under several liability] [t]he reasoning behind the one recovery rule no longer applies. . . . Because each defendant's share can now be determined, it logically follows that each may settle just that portion of the plaintiff's suit. The settlement does not affect the amount of harm caused by the remaining defendants and likewise should not affect their liability.[[20]]
The cases Robles relies upon are grounded in joint and several liability, and we see no reason (nor has Robles offered any) to apply a rule permitting full offset in the several liability context.[21] Instead, we join the United States Supreme Court,[22] the majority of other jurisdictions[23] and the Restatement *1021 (Third) of Torts[24] in adopting the proportionate share rule. Under this approach non-settling defendants are entitled to offset the plaintiff's damages in proportion to settling parties' comparative fault. Thus, Robles is entitled to an offset for only Petrolane's 43.75% share of the harm, and therefore remains liable for 56.25% of Gannaway's damages. Petrolane may deduct ninety percent of this amount from the monies it owes to Robles according to its assignment agreement with Gannaway.
While this approach recognizes the possibility that a plaintiff will secure total recoveries in excess of her damages as later determined by a jury (in a trial without all defendants present), there is no injustice in this result because the plaintiff bears the reciprocal risk of settling with a defendant for less than that defendant's comparative share of the harm as later determined by a jury, and may therefore end up collecting less than her damages as determined by the jury. To conclude otherwise would lead to significant unfairness because it would grant a non-settling defendant the benefit of a bargain for which he bore no risk. As the Restatement (Third) of Torts explains:
[A] plaintiff may recover more than the damages determined by the fact finder. That occurs when the plaintiff settles with one defendant for an amount greater than the settling tortfeasor's comparative share of the plaintiff's damages. This result is appropriate; since the plaintiff bears the risk of an inadequate settlement (in which case the plaintiff will recover less than the damages determined by the fact finder), the plaintiff should also obtain the benefit of a favorable settlement. Limiting the plaintiff's recovery to the damages determined by the fact finder would provide an unjustified windfall to the nonsettling defendant.[25]
Indeed, allowing full offsets under several liability would discourage settlement because a rational defendant would delay resolving the case in the hopes that another defendant's settlement would reduce or eliminate his liability.[26] Our strong policy favoring settlement as a positive method of case resolution[27] is a further reason to favor proportionate (pro rata) offset.
This conclusion is also supported by the overall uncertainty associated with settlement values. While the full offset rule assumes a direct relationship between settlement value and a plaintiff's actual damages, in practice settlement amounts reflect complicated and opaque considerations such as settling parties' respective risk propensities, *1022 the value of peace from further litigation, and a settling party's immediate financial situation. The value of a settlement is not perfectly related to a plaintiff's actual damagesindeed, the relationship may be only a rough approximationand thus there is no inconsistency or unfairness in allowing a plaintiff to recover more or less through partial settlement than the plaintiff could receive at trial.[28]
Moreover, we are unconvinced that Universal Motors, Inc. v. Neary[29] requires a full offset in this case. The superior court read Neary as entitling Robles to "offset [the] amounts Gannaway received from other defendants." Universal Motors, the appellant in Neary, argued that inconsistent adjudications would occur and plaintiffs might receive double recovery if we did not adopt the rule that a plaintiff may only bring one action in tort to obtain relief from all possible tortfeasors.[30] Specifically, Universal Motors offered a hypothetical situation in which a Plaintiff, P, sued one defendant, D1, in one action and the jury allocated fault evenly between them.[31] If P then sued a second defendant, D2, Universal Motors contended that the jury could allocate fifty percent of fault to D2.[32] Consequently, Universal Motors maintained that P could receive full compensation for his injuries even though two juries had found him fifty percent at fault.[33] The superior court in this case based its interpretation of Neary on our response to this hypothetical. We rejected Universal Motors's claim that the appellant could obtain double recovery because we held that D2 was entitled to offset his liability against D1's liability.[34] We thus observed that P could obtain no more than the jury awarded in the first trial.[35] But Neary does not control this case, for it concerned the one-action rule, which requires a plaintiff to join all defendants in one action. We discussed the possibility of an offset in response to the defendant's argument that, without a one-action rule, a plaintiff could separately sue multiple defendants, allowing plaintiff to collect more than full damages from defendants in separate cases; we allowed a full offset to prevent such an outcome. That analysis is not applicable where, as here, the case involves multiple defendants in the same suit. Both Robles and Petrolane were included in the same action and the jury made findings regarding the comparative fault of all parties. Consequently, Neary neither controls this case nor supports application of a full offset.
Indeed, our Neary discussion was not inconsistent with the proportionate share approach. In Neary we observed that D1 would pay for more than its comparative share of the harm and D2 would pay for less than its share.[36] To address this problem we noted that D1 might be able to secure common law contribution, and we cited to the Restatement section which recommends allowing contribution where all necessary defendants were not joined in the initial action.[37] Although we did not pass judgment about whether such a remedy was then available in Alaska, we later recognized that it was available because it furthered the goal of apportioning tort losses in accordance with each responsible person's percentage of *1023 fault.[38] This common law remedy thus comports with the proportionate share approach. By suing defendants in two separate actions, the hypothetical plaintiff would undermine the relationship between a party's share of the harm and its actual payments, and contribution would allow a defendant who overpaid to ensure that he does not end up paying for more than his share of the harm. Where, however, the comparative fault of all parties has been jointly determined, there is no danger of parties over- or under-paying, and thus neither offsets nor a contribution remedy would be appropriate.
We reject the dissent's reliance on AS 09.17.080(c)a statute not cited or relied upon by the appellee in this caseand the dissent's interpretation of that statute. As of October 6, 1993, when the accident occurred, AS 09.17.080(c) provided:
The court shall determine the award of damages to each claimant in accordance with the findings, subject to a reduction under AS 09.16.040, and enter judgment against each party liable. The court shall also determine and state in the judgment each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault.
But in 1988 the voters by initiative had repealed AS 09.16, including AS 09.16.040. This case requires us to determine what effect, if any, we should give to the repealed statute.
In Benner v. Wichman,[39] we held that we were not prohibited from examining the repealed statute in interpreting a related statute where nothing in the related statute "suggests an intent to alter the provision's applicability."[40] In the present case, however, the related statuteAS 09.17.080contains subsection (d) which, as shown above, directly conflicts with the notion of fully off-setting a non-settling defendant's liability by a previous settlement by a co-defendant.
We are therefore not persuaded that former AS 09.17.080(c)'s reference to AS 09.16.040 provides support for the dissent's position. The dissent appears to construe the "subject to" language of § .080(c) as an invariable command to reduce under AS 09.16.040, regardless of that section's repeal. In effect, this interpretation would require us to read § .080(c) as thought it said that the court must determine the award of damages, "subject [it] to a reduction under AS 09.16.040," and enter judgment. But as actually adopted, the "subject to" phrase omits the "it." As we understand the phrase, "subject to a reduction" under AS 09.16.040 simply means that a judgment entered under § .080(c) will remain "subject to reduction" under AS 09.16.040 provided that the statute appliesin other words, the phrase just reserves the right to apply § .040 to the extent that it applies by its own terms.[41] Under this view of the phrase, § .080(c) would not require a reduction under AS 09.16.040 in this case: the reduction statute does not apply by its own terms here, because the settlement in this case was reached after the statute was repealed.
It might seem tempting to reject this interpretation because it appears to lead to a strange result: why would the electorate have wanted to reserve the right to apply a law it had just repealed? One explanation might be simple drafting error on the part of the initiative's sponsors. But another may lie in the timing of the repeal of § .040 and the adoption of § .080(c).
Although § .080(c) was adopted at the same time as § .040 was repealed, the effective date of § .040's repeal does not necessarily establish the date when the repealed law *1024 would cease to affect cases to which the new § .080(c) applied. Since releases and covenants are contractual, the meaning and scope of a given settlement agreement would be determined by the law in effect when it was reached; conversely, later changes in the law governing settlements would not alter the existing settlement's terms. Thus, despite its repeal, AS 09.16.040's requirements would continue to control any settlements reached before that statute's repeal in actions filed after the repeal.
On the other hand, § .080(c)'s new liability provisions would apply prospectively to new claims accruing after enactment. Under the discovery rule, claims for the same injury can accrue at different times against different tortfeasors. Thus, it seems predictable that in some cases accruing against particular tortfeasors after § .080(c)'s enactment, there would already be pre-enactment settlements for the same injury involving other tortfeasors against whom claims had accrued at an earlier point. Because § .040's reduction requirement would continue to apply to these settlements, the drafters of § .080(c) could reasonably have decided to include language in § .080(c) to cover these situations by specifying that a judgment under § .080(c) would remain "subject to a reduction under AS 09.16.040" if that statute applied to the case.
This rationale might also provide a plausible explanation for the otherwise unexplained repeal of § .080(c)'s "subject to" provision in 1997. The number of potential new claims for injuries involving pre-1989 settlements would inevitably dwindle and approach a vanishing point over time. Thus, by 1997 it simply might have become clear that § .080(c)'s reference to former § .040 was just a vestige and served no further purpose.
Alternatively, as noted above, § .080(c)'s reference to the repealed § .040 may have been a drafting mistake by the sponsors of the 1988 initiative. And the legislative repeal in 1997 of § .080(c)'s "subject to" provision may have simply reflected the legislature's desire to rectify this mistake. In either event, we conclude that AS 09.17.080(c)'s reference to AS 09.16.040 does not compel the result reached by the dissent. We likewise reject the dissent's claim that AS 09.17.080(c)'s reference to the repealed AS 09.16.040 was "critical language" that dictates the result favored by the dissent.
In sum, we do not think the voters intended to allow non-settling defendants to escape paying for harms that they caused. While we had previously indicated that full offsets were appropriate in the context of multiple actions and joint liability, rote application of the rule in the pure several liability context would discourage settlements and lead to substantial unfairness. Proportionate share offsets are logical incidents of several liability, and in recognizing them we simply adopt the most efficient and well-accepted solution.
2. Petrolane did not waive any legal arguments by failing to make, an offer of proof or otherwise present the second trial court with evidence of Gannaway's claims.
Robles argues, even assuming that Petrolane's legal arguments are meritorious, that Petrolane has waived them because (1) "Petrolane and Shoreside presented no evidence concerning [Robles's] liability for Gannaway's injuries," specifically by failing to file a motion in limine, present an offer of proof, or adduce evidence at the remand trial concerning Gannaway's claims; (2) this in turn precluded Robles "from presenting evidence that would negate his potential liability;" and (3) there was "no judgment after the remand that addresses liability on the part of Robles for Gannaway's injuries."
In support of his argument, Robles quotes from our decision in Agostinho v. Fairbanks Clinic Partnership[42] where we stated that "a party waives its right to challenge the exclusion of evidence unless an offer of proof as to the substance of the evidence is made at the time the evidence is excluded."[43] He argues that because no offer of proof was made, appellate review is precluded because "there is no showing that it was prejudicial to refuse to admit the excluded evidence."
*1025 The passage cited by Robles clearly indicates that an offer of proof is needed to challenge the exclusion of evidence. It is not, however, needed to prevent waiver of a legal argument. Having received an assignment from Gannaway for his claims against Robles, Petrolane asked the superior court to credit the assignment against its liability to Robles. The superior court declined to grant Petrolane a credit because it read Neary as requiring a full offset; it reasoned that as Petrolane had already paid Gannaway more than the first jury's determination of his damages, neither Gannaway nor Petrolane as his assignee could collect from Robles. The court did not exclude evidenceit rejected a legal argument. Furthermore, the "evidence" that was related to this legal issueGannaway's settlement with and assignment of claims to Petrolanewas uncontroverted and part of the record. Accordingly, Robles's argument regarding offers of proof is irrelevant to the disposition of this case.
Robles next argues that Petrolane's claim of a credit for Gannaway's assignment required relitigating Robles's (and other parties') liability for Gannaway's injuries. He notes that he was "prepared to go forward" on the issue of his liability to Gannaway and that he was prejudiced by his inability to present relevant evidence. Robles is incorrect. As he himself notes, the first jury found that he was fifty percent liable for Gannaway's injuries, and that Gannaway had not been negligent at all. While we remanded to allow a second jury to consider Shoreside's potential liability and its potential effect on the comparative fault of the parties, we did not disturb the findings concerning Gannaway's non-negligence or the amount of his damages and, as explained in Part IV.B., the remand order did not require reconsideration of the fact that Robles and Petrolane were both partially liable.[44] Robles is thus precluded from relitigating his liability to Gannaway.[45] His waiver argument is therefore meritless.
B. The Superior Court Correctly Instructed the Jury on Petrolane and Robles's Negligence and Liability.
We concluded our opinion in Robles v. Shoreside Petroleum, Inc. by remanding "the issue of Shoreside's negligent failure to warn and on related issues of causation and comparative fault."[46] Before the second trial, Petrolane moved in limine to "prohibit instructions, argument, and evidence related to the jury findings in the first trial." The superior court refused to grant Petrolane's request. The court instructed the jury before trial that it had already determined that (1) Petrolane negligently trained Gary Robles and that its negligence was a legal cause of his harm; (2) Gary Robles was negligent and that his negligence was a legal cause of his own harm; (3) Shoreside negligently trained Gary Robles; and (4) Petrolane and Gary Robles were at least one percent at fault. The instructions directed the jury not to reexamine these issues or discuss why the court already decided them.
Petrolane maintains that the court's jury instructions and comments "created two categories of defendants from the outsetone defendant (Petrolane) obviously at fault . . . and one (Shoreside) where the judge could not decide whether any fault existed." According to Petrolane, "[t]his obvious dichotomy prejudiced Petrolane," by "ma[king] it less likely that the jury would find Shoreside at fault," by "dramatically alter[ing] the nature of the proof presented by the parties," and by rendering the jury "unable to truly apportion fault in the manner intended by statute and by this Court." Petrolane argues that this case should be remanded and the trial court instructed to empanel a new jury to reconsider comparative fault.
Allegedly erroneous jury instructions are grounds for reversal only if "they were objected to and caused prejudice."[47] The party appealing a trial court's decision to give or refuse to give certain jury instructions *1026 has the burden of showing that the instructions caused prejudicial error.[48] An error is prejudicial if "we determine the verdict would have been different had the erroneous instruction not been given."[49] We determine whether an error is prejudicial by placing ourselves in the jurors' position and considering whether the erroneous instructions "probably affected their judgment."[50]
Petrolane does not claim that the court prevented it from presenting evidence demonstrating Robles's and Shoreside's comparatively high portion of fault and its own lack of fault. Rather, Petrolane complains that "the jury never had an opportunity to assess the comparative fault of the parties," because the trial court "periodically informed and instructed the jury that the fault of Petrolane and Robles were established facts, and that it need only determine whether Shoreside was at fault." Petrolane insists that "[i]n determining comparative fault, a jury must be presented with all relevant liability evidence, and must draw its own conclusions as to negligence and causation on the part of each of the parties." Therefore, Petrolane continues, "there was no reason to inform the second jury of the bare conclusions of the first jury." We disagree.
The negligence and fault of Petrolane and Robles were established by the first jury.[51] This court affirmed the first jury's findings of Petrolane's negligence, Robles's negligence, and their combined legal causation of the accident. We remanded only for determination of Shoreside's possible negligence and the comparative fault of all parties in light of this new determination.[52] Thus, under the doctrine of law of the case, the trial court properly granted preclusive effect to these findings. This doctrine "prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case. Even issues not explicitly discussed in the first appellate opinion, but directly involved with or `necessarily inhering' in the decision will be considered the law of the case."[53] Thus, previously adjudicated issues may be reconsidered only in the face of "exceptional circumstances presenting a clear error constituting a manifest injustice."[54] The reasons for this doctrine include "(1) avoidance of indefinite litigations; (2) consistency of results in same litigation; (3) essential fairness between the parties; and (4) judicial efficiency"[55]in short, all of the concerns raised by Petrolane's argument. Had its deliberations not been limited by the issues properly decided in the original verdict, the second jury might easily have returned a verdict contradictory to the portions of the first verdict that this court already upheld, bogging down courts and litigants in a confusing and contradictory set of verdicts.
Petrolane concedes that law of the case is applicable here, but argues that the doctrine has no effect. Petrolane interprets the language of our earlier remand to require determination of not only the issues of Shoreside's negligence and causation between its negligence and the harm and the comparative fault of the parties, but also retrial on the negligence of all of the parties. We reject this interpretation. The error in the first trial stemmed from the court's refusal to allow presentation of a particular theory of *1027 negligent conduct by Shoreside.[56] Our remand required that the superior court allow the jury to determine the comparative fault of the parties in light of this additional theory of negligence.[57] We did not require the issue of Petrolane's and Robles's negligence to be relitigated because the determination of their negligence was not hindered by the failure to consider all the other theories of Shoreside's negligence.[58]
We also reject Petrolane's argument that the jury instructions influenced the jury by creating "two categories" of defendants for two reasons. First, the record indicates that the superior court sufficiently instructed the jury not to draw any inferences from the fact that the negligence of Robles and Petrolane had already been determined. The superior court's jury instructions stated clearly that, aside from the facts listed above, it had "not intended to give the jury any direction or instruction on how it should determine any party's actual percentage of fault in this case." The superior court acted in accordance with our remand, telling jurors that "what you're going to be hearing during the course of this trial is the parties presenting evidence as to who did what to enable you as jurors to decide what percentage of fault should be apportioned to what party." The court explained that "[i]n determining the percentages of fault, the jury should consider the nature of the conduct of each person at fault." The judge went on to note that "although the court has already determined . . . that Petrolane was negligent, I haven't determined the extent or the degree of the negligence and the jury may decide it was one percent or fifteen or fifty or seventy-five or ninety-nine percent." Finally, the court cautioned the jury: "don't read anything in that somehow the judge must be suggesting what the answer is."
Second, Petrolane only offers one case in support of its argument: Kava v. American Honda Motor Co., Inc.[59] In Kava a jury found for the plaintiff on a products liability claim, and determined total damages and apportioned liability between the plaintiff and defendant, but deadlocked on the plaintiff's negligence claim.[60] We remanded the negligence claim and required the second jury to reassess comparative fault because the original jury verdict form did not distinguish between the products liability and negligence claims.[61] Petrolane asserts that Kava "established that instructions referring to the partial conclusions drawn by another jury should have been rejected." However, in Kava we required comparative fault be retried because we found "good reason" to believe that jurors would have been likely to award greater comparative fault to the defendants if liability had been determined under negligence as opposed to under strict liability.[62] Nowhere does Kava state that in order to apportion fault on a remanded claim, the jury must retry the liability of other parties as well. A new determination that Shoreside was liable would have altered the percentage of fault borne by each party, but it would not have altered the simple fact of Petrolane and Robles's liability for their already-established negligence. Thus, we do not read Kava's conclusion that "a new trial *1028 will be necessary on the issue of comparative fault,"[63] as indicating that the basic liability of all parties, as opposed to simply Shoreside, had to be relitigated.[64]
In light of these considerations, we hold that Petrolane has not met its burden of showing that it was prejudiced by the information and instructions the superior court furnished to the jury.
V. CONCLUSION
Because we hold that a proportionate share offset is appropriate under several liability, we REVERSE and REMAND the issue of Robles's offset for Petrolane's prior settlement with Gannaway for further proceedings in accordance with this opinion. Because we hold that the superior court properly instructed the jury about Petrolane and Shoreside's negligence, we AFFIRM on this issue.
EASTAUGH, Justice, with whom MATTHEWS, Justice, joins, dissenting in part.
EASTAUGH, Justice, with whom MATTHEWS, Justice, joins, dissenting.
I respectfully dissent from that part of the court's opinion that declines to subtract the amount received in the prior settlement from the damages award for this 1993 accident. The result the court reaches is contrary to the text of the statute that controls, AS 09.17.080(c) as it read in 1993. It is also contrary to our decisions that determine how we apply that statute and to the principle of compensation that has governed a negligent tortfeasor's liability in Alaska.
1. Introduction. Our disagreement arises because AS 09.17.080(c) continued to include the words "subject to a reduction under AS 09.16.040" after the 1988 initiative eliminated joint liability by amending AS 09.17.080(d). That initiative did not delete those words or otherwise amend subsection .080(c), even though it repealed AS 09.16.
The court's opinion concludes that former AS 09.17.080(c) does not apply here and that the "proportionate share rule" (or "pure several liability regime") embodied in AS 09.17.080(d) does.[1] This conclusion is problematic for several reasons.
Because the two subsections coexisted side-by-side when this claim arose in 1993, the court must reconcile themand the principles they embodyif it can. For reasons I discuss below, it can. The court should therefore apply AS 09.17.080(c) and subtract the settlement from the award.
A more subtle problem may underlie the court's opinion. It does not seem to hold that subsection .080(d) directly applies; it instead seems to resolve the reduction dispute by choosing to "adopt" the principle of pure several liability embodied in subsection .080(d) after the 1988 initiative became effective.[2] Because the express words of former AS 09.17.080(c) apply here, the only justification for not applying them must be that a different subsection applies more directly or that the "subject to a reduction" language has been at least implicitly repealed or amended. The court does not clearly engage in the analysis needed to follow either approach. If subsection .080(c) applies, we do not have the option of choosing to "adopt," even by analogy to a principle expressed in a different statute, a different method of offsetting the prior settlement.
The facts are complex, but they can be simplified to this model: Two negligent tortfeasors caused a person to suffer personal injury in 1993. The plaintiff settled with one tortfeasor for $80,000 and proceeded to trial against the second. At trial the jury found *1029 for the plaintiff, found plaintiff's compensatory damages to be $100,000, found the settling tortfeasor forty percent responsible for the accident, and found the nonsettling tortfeasor sixty percent responsible.[3] These findings resulted in a jury verdict against the nonsettling tortfeasor for sixty percent of $100,000. Were it not for the prior settlement, the liability of the nonsettling tortfeasor per AS 09.17.080(d) would have been $60,000.
The question here is whether the nonsettling tortfeasor's liability may exceed the difference between the jury's award and the amount plaintiff received in settlement from the settling tortfeasor. The plain words of the controlling statuteformer AS 09.17.080(c)answer that question. The answer is "No." But per today's opinion the answer is "Yes." Invoking the principle of several-only liability and the 1988 amendment to AS 09.17.080, it holds that the award must be reduced "pro rata" (by the percentage of responsibility the jury allocated to the settling tortfeasor), and not "pro tanto"(by the amount of the prior settlement).
The opinion relies on principles and policy choices that were not reflected in the text of AS 09.17.080(c) as it existed in 1993. In my view, the text of that subsection as it then read and our pertinent case law preclude the choice the court makes here.
The court correctly observes that the appellee has not cited subsection .080(c),[4] but we must reach the issue anyway. The issue is inherent because we are being asked to apply subsection .080(d), and its application turns on the applicability of a co-existing statutory neighbor of which we are aware.[5] Also, the appellee argues that subsection .080(d) does not apply, argues that the settlement must be subtracted from the award, invokes the tort principle (avoidance of double recovery) underlying subsection .080(c), and cites our offset decisions in support. At least one of those cases applies AS 09.16.040,[6] the reduction statute to which subsection .080(c) expressly referred until 1997. We must therefore decide whether AS 09.17.080(c) applies.
2. The Applicable Statutory Scheme. Alaska Statute 09.17.080 concerns apportionment of damages. As of October 6, 1993, when the accident occurred, section .080 provided:
Apportionment of Damages. (a) In all actions involving fault of more than one party to the action, including third-party defendants and persons who have been released under AS 09.16.040, the court, unless otherwise agreed by all parties, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating
(1) the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
(2) the percentage of the total fault of all of the parties to each claim that is allocated to each claimant, defendant, third-party defendant, and person who has been released from liability under AS 09.16.040.
(b) In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault, and the extent of the causal relation between the conduct and the damages claimed. The trier of fact may determine that two or more persons are to be treated as a single party if their conduct was a cause of the damages claimed and the separate act or omission of each person cannot be distinguished.
(c) The court shall determine the award of damages to each claimant in accordance with the findings, subject to a reduction under AS 09.16.040, and enter judgment against each party liable. The court also shall determine and state in the judgment each party's equitable share of the obligation *1030 to each claimant in accordance with the respective percentages of fault.
(d) The court shall enter judgment against each party liable on the basis of several liability in accordance with that party's percentage of fault.
(Emphasis added.)[7] The emphasized passage contains the critical words. They provide that the award is "subject to a reduction under AS 09.16.040."
The version of AS 09.16.040 to which AS 09.17.080(c) referred provided:
Release or covenant not to sue. When a release or covenant not to sue or not to enforce judgment is given in good faith to one or two or more persons liable in tort for the same injury or the same wrongful death
(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and
(2) it discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.
(Emphasis added.)[8] The emphasized words called for a reduction (pro tanto) by the amount of the settlement. In 1997 the legislature amended section .080(c) by deleting this text: ", subject to a reduction under AS 09.16.040."[9] This is the text that requires the reduction in this case.
Unless context requires greater specificity, I refer to the version of section .080 set out above as AS 09.17.080 or "former" AS 09.17.080. Likewise, unless context requires otherwise, my references to AS 09.17.080(c) are to the version quoted above.
The court's opinion relies on the principles reflected in subsection .080(d). But subsection .080(c) contains the language that controls this case, which concerns the topic of reducing a plaintiff's recovery by the amount plaintiff received in a prior settlement. Subsection .080(c) expressly addresses that topic. Subsection .080(d) does not address it expressly or impliedly, and is irrelevant to the issue presented here.
There are several different ways to carry out the reduction required by subsection .080(c). Each requires that the amount of the prior settlement be subtracted (thus, reduced pro tanto) from the jury's award at trial, and each precludes the pure pro rata reduction approach chosen by this court.
The words of subsection .080(c), as it read in 1993, required the superior court to engage in a three-step reduction process. It was first to "determine the award of damages to each claimant in accordance with the findings." This award was then "subject to a reduction under AS 09.16.040." Finally, the court was to "enter judgment."
As applied to Robles, the words "the award of damages to each claimant in accordance with the findings" seem to mean the total damages found by the first jury as reduced by the percentage of fault found by the second jury. These collectively are the "findings" that determined the damages "award" (whether they were returned by one jury or two). Subsection .080(c) next required that the "award of damages" so calculated be "subject to a reduction under AS 09.16.040." Under former AS 09.16.040, amounts paid in settlement reduced the claim against the other tortfeasors. After making this reduction, the court was required by AS 09.17.080(c) to enter judgment. Thus, subsection .080(c) required the court to subtract *1031 the amount of the prior settlement from the damages award before the court entered judgment against the trial defendant. In this case, that meant the trial award had to be reduced by the full amount Gannaway previously received in settlement, and that the superior court did not err in making that reduction.
Read most rigorously, the words of subsection .080(c) required that damages be reduced first by the percentage of responsibility allocated to anyone (including the settling tortfeasor) other than the trial defendant, and then by the amount of the prior settlement. Although this could in some circumstances result in judgments that arguably under-compensated plaintiffs, this is the process the controlling statute specified.
Section .080 can alternatively be interpreted to call for a comparative reduction approach that respects the different principles underlying the two subsections. I read those subsections to reflect two different, but reconcilable, principles: avoidance of overcompensation or double recovery, achieved by requiring pro tanto (subtractive) reduction for amounts previously recovered in settlement (per subsection .080(c)); and avoidance of joint liability, achieved by requiring that the judgment against each party be based on several liability (per subsection .080(d)). The two subsections thus impose different limitations having different purposes. And because they impose limitations on the judgment, applying the subsection requiring the greater limitation in a given case does not conflict with the other subsection. The advantage of this approach is that it does not ignore statutory text (here, "subject to a reduction under AS 09.16.040") and considers the effect of both tort reform limitations.
The best way to reconcile the two provisions is to apply them comparatively in cases to which they both apply. Thus, a pro rata reduction would occur if it were needed to satisfy the several-liability-only policy of subsection .080(d). And a pro tanto reduction for a prior settlement would occur if it were needed to satisfy the requirement of subsection .080(c) that makes an "award of damages to each claimant . . . subject to a reduction under AS 09.16.040." To ensure that the judgment as entered only reflected each defendant's several liability and thus satisfied subsection .080(d), a trial court following the comparative reduction approach would have compared the result of the pro tanto reduction with the result of a pro rata reduction. A pro tanto reduction required by subsection .080(c) insufficient to reduce the nonsettling defendant's liability below its proportionate share of the total damages would have the effect of imposing joint liability on the nonsettling defendant, contrary to subsection .080(d). To avoid that result, the final judgment in that situation would have to be based on the pro rata calculation. This calculation would also avoid overcompensation, because the judgment would necessarily be no greater than the amount calculated under subsection .080(c). Similarly, if a judgment based on pure several liability nonetheless exceeded the amount calculated after pro tanto reduction for a prior settlement, calculating the judgment per subsection .080(c) would best reconcile the demands of both subsections.
In effect, the two subsections can be reconciled by applying them in a way that carries out the policies that underlie them.
A hypothetical example illustrates this approach: plaintiff settles with one of two joint tortfeasors for $80,000. A jury finds plaintiff suffered damages totaling $100,000 and finds each tortfeasor fifty percent responsible. The approach first discussed above requires that the $80,000 settlement be subtracted from the nonsettling tortfeasor's proportionate share of the damages, resulting in no recovery for the plaintiff.[10] Under the comparative approach next discussed, the $80,000 settlement amount is subtracted from the $100,000 total damages finding. Because the nonsettling tortfeasor's resulting post-offset $20,000 liability is less than that tortfeasor's $50,000 proportionate share of the total damages, the purpose underlying subsection *1032 .080(d)protecting the tortfeasor from paying for harm caused by other tortfeasorsis fulfilled and no further reduction is required. The final recovery is $20,000.[11]
And if the settling tortfeasor instead paid $20,000, a pro tanto reduction from the total amount of damages would only reduce the damages award to $80,000. Because subsection .080(d) prohibits courts from requiring tortfeasors to pay more than their proportionate share of damages, the nonsettling tortfeasor's liability cannot exceed $50,000.[12]
This comparative approach trades the statute's plainer reading first discussed above for a process that respects both reductive principles reflected in the two subsections, and leads to an arguably more equitable reduction formula. It is also the method the superior court applied in Navistar International Transp. Corp. v. Pleasant.[13]
But either method of calculation I discuss has the same effect on today's case: the claimant recovers nothing. And either method requires a pro tanto reduction. The problem with the court's opinion is not that it adopts the incorrect method for applying the reduction required by subsection .080(c)'s reference to AS 09.16.040, but that it declines to apply subsection .080(c) at all.
Subsection .080(c)'s continued reference to AS 09.16.040 until 1997 might seem problematic at first glance; AS 09.16.040, after all, was repealed in 1988.[14] But we are not free to ignore the express words of AS 09.17.080(c) on a possible theory they had no meaning. We dealt with a similar interpretive problem involving AS 09.16.040 and AS 09.17.080 in Benner v. Wichman.[15] That case required us to interpret a reference in AS 09.17.080(a) to AS 09.16.040 after section .040 (and, indeed, all of Chapter 16) had been repealed. We there looked to the repealed statute in attempting to carry out the drafters' intentions because we regarded the repealed statute as "integral" to understanding the disputed language in AS 09.17.080(a).[16]
Today's opinion advances several reasons for declining to apply subsection .080(c). Its primary reason seems to be that the "subject to a reduction under AS 09.16.040" clause "simply means" that a judgment is subject to reduction under that statute "provided that the statute applies."[17] And, per the court, AS 09.16.040 does not apply because it was repealed before the settlement was reached.[18]
The court is looking at the wrong statute. Section .040 was repealed in 1988, but the critical text of subsection .080(c) was not. We cannot simply ignore the words of subsection .080(c). Until 1997 they provided that the award is "subject to a reduction under AS 09.16.040."
The court's opinion reads subsection .080(c) as though it contains qualifying words such as "provided that the statute applies." It does not, of course. But if it had, it would still apply here, because it addresses the topic in issue here, reduction for a prior settlement. The court's opinion also reads the statute as though it merely states that an award is "subject to AS 09.16.040." But it *1033 actually states that the award is "subject to a reduction" under AS 09.16.040. (Emphasis added.) The difference is significant.[19]
The court's opinion advances another theoretical explanation for the existence of the "subject to" clause until 1997: The clause usefully protected contractual expectations arising out of settlements reached before the 1988 initiative became effective, until it was clear by 1997 that the clause was vestigial and could be repealed.[20] Given that imputed purpose, the court seems to reason that there is no need for reduction for post-1988 settlements.
There is no basis for thinking that initiative adopters or the legislature, by retaining the "subject to a reduction" language for about nine years after voters approved the initiative, intended to protect contract expectations. No legislative history supports that notion, and reality seems to rebut it. The contracting parties in a tort settlement are the tort plaintiff and the settling tortfeasor. The latter has no interest in how section .080 is applied and the former derives no protectible contractual benefit as against nonsettling tortfeasors (who are not party to the contract). No relevant expectation benefitting the plaintiff arises from the contract itself. (Even if a statute might give rise to expectations, the continued existence of the "subject to a reduction" clause would have rendered unreasonable any expectation that settlements would no longer reduce trial awards in Alaska after 1988.) Settlement incidentally benefitted the nonsettling tortfeasor, who had the statutory right to a reduction for the amount of the settlement. But that right derived from the fact of payment, not the contract itself. So it is hard to imagine that the reduction language was retained for the limited purpose of protecting contractual rights. It is therefore equally implausible to think that the date of settlement is relevant to the statutory analysis required here. The relevant date is the date when the cause of action accrued. By accruing before 1997, this cause of action is governed by the "subject to a reduction" clause.
The court's opinion, in alternatively suggesting that subsection .080(c)'s reference to the repealed AS 09.16.040 may have been a "drafting mistake,"[21] may assume that the 1988 initiative was intended to repeal the reduction language in subsection .080(c). There was no such express repeal and there was no expression of any such intention.[22] Or the opinion may assume a degree of inconsistency between subsection .080(c) and subsection .080(d) that can be resolved only by holding that there was an implied repeal. Any such assumption would be problematic.
Because we can reconcile the text and the effect of subsections .080(c) and (d), we cannot assume the implied repeal of the pro tanto reduction language in subsection .080(c). Reconciliation turns on recognition that the two subsections have different purposes and that they focus on different aspects of tort damages. Subsection .080(d), read literally, focuses on the parties who are being held liable at trial. It does so by addressing judgment "against each party liable" and by adopting several-only liability, fundamentally limiting defendants' liability. In comparison, the first two clauses of subsection .080(c) focus on what claimants may recover. Thus, those clauses address the award "to each claimant" as calculated "in accordance with the findings," and therefore take into account any fault of the plaintiff as well as the fault of the tortfeasors. The two subsections can be reconciled by reading subsection .080(c) to limit what a plaintiff can recover (because it requires a reduction of the plaintiff's award per AS 09.16.040) and by reading subsection .080(d) to limit what a *1034 defendant can be made to pay (because entering judgment "on the basis" of several liability under that subsection does not necessarily foreclose any other limitation, such as a reduction for amounts previously received). The two subsections can be read together to limit the amount a plaintiff can recover from the defendants at trial, both by limiting a plaintiff's total compensation and by limiting a defendant's individual exposure. The two subsections can be most clearly reconciled by applying the comparative reduction methodology discussed above on pages 7-10.
If we ignore this method of reconciling the two subsections, they can be read to conflict, on a theory the pro tanto reduction subsection .080(c) required was inconsistent with the pro rata reduction subsection .080(d) seemed to require. But this conflict is only implied, and it is not obvious how it should be resolved. To resolve it as the court's opinion implicitly seems to do (by declining to apply subsection .080(c)) reads words out of the statute, and renders them not merely innocuously superfluous, but actively irreconcilable.[23] This requires us to ignore specific statutory text dealing with a specific topic (subtractive reduction for amounts previously received) in favor of general language that unspecifically calls for entry of judgment "on the basis of" several liability.[24] It also raises questions about the effect of the 1997 express repeal.
It is theoretically possible to surmise that an intention to adopt several-only liability cannot be reconciled with the subtractive reduction subsection .080(c) requires. But the only (or main) perceived evil being addressed in 1988 was any form of joint liability, i.e., any principle by which a defendant at trial could be required to pay more than its pro rata share of the damages. Avoiding joint liability does not necessarily conflict with a reduction for prior settlements, nor does the methodology conflict if the comparative approach is applied.
I am not prepared to hold that the 1988 amendment somehow repealed the critical words of subsection .080(c). The court's opinion may reason that what it calls "pure" several liability[25] somehow nullifies subsection .080(c)'s reduction language. To the extent the opinion's analysis turns on its characterization of the amendment's purpose, I am unconvinced. The 1988 amendment had the purpose and effect of repealing any remaining possibility that defendants would be exposed to joint liability.[26] Ending defendants' exposure to joint liability is not inherently and thematically at odds with reducing a plaintiff's award by the amount of a prior settlement or recovery. Thinking that pure several liability had a purpose of benefitting injured plaintiffs ignores the history of tort reform in Alaska. Several-only liability was adopted in 1988 to prevent modified joint liability;[27] plaintiffs' loss of an opportunity to hold defendants jointly liable was regarded as detrimental to plaintiffs and beneficial to defendants.[28] Throughout its history, Alaska tort reform has focused on limiting defendants' liability and reducing the cost of *1035 liability insurance.[29] Supporters of tort reform memorialized no concern about whether tort defendants at trial might pay less than their share of damages or that trial awards might under-compensate tort plaintiffs.[30]
In any event, several-only liability is not necessarily at odds with a policy choice of requiring reductions per the language of subsection .080(c). The concept of several liability does not preclude a reduction for prior settlements. Likewise, pure several liability was adopted because even modified joint liability was considered undesirable.[31] Joint and several liability (and, later, several and modified joint liability) were features of Alaska tort law for many years.[32] Defendants' exposure to joint liability provoked several statutory amendments. Consequently, as of 1988 (and thus as of October 6, 1993) a drafter could have both rationally intended that subsection .080(d) would simply abolish joint liability and logically reasoned that several liability would determine the maximum amount (not the final amount) of a judgment against a defendant. A drafter likewise could have reasoned that subsection .080(c), by requiring the specified reduction before entry of judgment, was not inconsistent with foreclosing judgments based on joint liability. The history of tort reform in Alaska reflects a series of partial measures addressing a few aspects of tort law at a time. The 1988 interest in addressing one perceived problemjoint liabilitydoes not prove an interest in addressing all other possible problems, as well.
Moreover, reading subsection .080(c) to require a subtraction of the amount received *1036 notwithstanding subsection .080(d) is consistent with our decisions interpreting analogous statutes. The superior court here applied what we said about reduction in Universal Motors, Inc. v. Neary (which arose under the same statutory regime).[33] As the next part of my dissent discusses, subtractive reduction for prior tort settlements was long a feature of Alaska law. A drafter aware of our decisional law could have rationally intended to retain the reduction feature expressed in former subsection .080(c).
Indeed, as of 1993 (and until 1997), AS 09.17.080 also contained two other references to AS 09.16.040 notwithstanding that section's repeal in 1988.[34] Those other two references and our treatment of one of them in 1994 argue against any implied repeal.[35]
In short, we are not free to disregard the statutory reduction language.
3. Our Precedent. Despite periodic statutory changes, our decisions discussing the applicable statutory scheme and its predecessors consistently recognized that an award against a negligent tortfeasor had to be reduced by amounts the plaintiff previously received as damages from other tortfeasors. This is so whether the prior recovery was by settlement or judicial award.
Navistar International Transp. Corp. v. Pleasant illustrated how the statutory reduction was to work.[36] It confirms that in Alaska, at least before 1997, a tort award had to be reduced at least by the amount of a prior settlement. Pleasant suffered personal injury in July 1986 and sued several alleged tortfeasors.[37] After the jury returned a verdict for the plaintiff against some of the tortfeasors but before judgment was entered, the plaintiff settled with one of the defendants for a large amount.[38] The settlement agreement allocated some of the settlement to punitive damages and the remainder to compensatory damages.[39] To calculate the judgment against the nonsettling tortfeasor, the superior court applied the comparative reduction approach I describe in Part 1. Thus, it compared the result of a pure pro tanto reduction per AS 09.17.080(c) with the result of a proportionate share calculation under the modified joint and several liability regime per AS 09.17.080(d) as it read when Pleasant was injured.[40] Because it found that the modified joint and several liability result was less than the pro tanto result,[41] it *1037 entered judgment based on the former result.[42] We reversed because the superior court, in reducing pro tanto, did not subtract the part of the settlement amount allocated to punitive damages; it therefore incorrectly concluded that the pro tanto reduction result was larger than the modified proportionate share result and therefore incorrectly entered judgment based on the latter method.[43] We confirmed that it was appropriate to reduce pro tanto; indeed, we reversed because the pro tanto reduction did not subtract the full amount of the prior settlement.[44] We raised no question about the superior court's use of the comparative reduction approach, and tacitly seemed to approve it. Nothing about the amendment to subsection .080(d) effective in 1989 renders the comparative reduction approach less appropriate or justifies complete failure to carry out the subsection .080(c) reduction approved in Navistar.
In Norcon, Inc. v. Kotowski,[45] Kotowski, claiming she had suffered sexual harassment in June and July, 1989, sued Norcon and Exxon for, among other things, compensatory damages for emotional distress and lost earnings.[46] She settled with Exxon before trial for $20,000.[47] The trial jury then awarded her compensatory damages of about $10,000 against Norcon,[48] which argued on appeal that the amount of the Exxon settlement had to be subtracted from the jury award to avoid a double recovery.[49] We agreed, citing Navistar.[50]
In Neary, we considered whether the "one-action rule" barred Neary's second personal injury lawsuit for a 1994 accident.[51] We held that the statutory regime then in effect (the same regime that applies here) did not mandate a single action for each injury or accident.[52] We also reasoned that it was not necessary to adopt a one-action rule to prevent inconsistent results or double recoveries.[53] We so concluded because we recognized that the damages award at a second trial had to be offset by what a plaintiff had already received at a first trial.[54] In support, we cited Norcon and Navistar.[55]
In Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin, we held that "consideration paid" in AS 09.16.040(1) included amounts paid per a loan receipt even if plaintiff had to repay the amount so received.[56] "`[A]nything received by way of a covenant not to sue operates as a payment pro tanto upon any judgment obtained against the others.'"[57] We recognized that the reduction was pro tanto.[58]
In Chenega Corp. v. Exxon Corp., we again recognized that non-collateral source payments received by a plaintiff must be deducted from a jury award against a tortfeasor.[59]
*1038 The court's opinion today distinguishes these opinions on the theory they turn on statutes that predated the "pure several liability regime enacted by initiative in 1988."[60] But the 1988 initiative did not repeal the language in AS 09.17.080(c) that required a reduction in accordance with AS 09.16.040.
Our decisions therefore confirm that the applicable statutes require a pro tanto reduction, at least for purposes of applying the comparative reduction approach that the superior court used and that we tacitly approved in Navistar.[61] Because the pro tanto statutory reduction requirement recognized in those cases cannot be reconciled with the pro rata reduction approach adopted here, stare decisis forecloses the result the court's opinion would reach unless the court addresses and overrules this precedent.
The court's opinion does not discuss or apply the analytical standard that we use in deciding whether to overrule our past precedent. But it is hard to see how that standard could be satisfied here.[62] There is no basis for thinking our past decisions were wrong when we issued them; they appropriately relied on AS 09.17.080(c) as it read until 1997. The policy choice between pro tanto and pro rata reduction is not so one-sided that we can now say that our decisions applying a pro tanto approach were wrong when decided. After we issued those opinions no conditions changed relative to when this cause of action accrued in 1993. It likewise cannot be said that more good than harm would result from departing from our precedent: The statutory issue now before us seems unlikely to arise again, given that the 1997 amendment has now been in effect for nine years. It seems unlikely the issue will recur. There is no pressing reason to reinterpret statutory text that has not existed since 1997. The harshness the court's opinion perceives in applying a pro tanto reduction cannot justify overruling precedent that originates in the policy choices the statute reflects. But to the extent pro tanto reduction may lead to a harsh result, harshness is avoided by reading the statute to provide for the comparative reduction approach discussed in Part 2, above, and applied in Navistar. The avoidable possibility of a harsh result cannot justify overruling our prior decisions.
4. Tort Principles of Compensatory Damages. Several value judgments seem to underlie the court's analysis. The opinion seems to reason that a "central purpose" of the 1988 initiative was to ensure that tortfeasors are held accountable for the harm they cause.[63] It perceives signs of this policy in expressions of an intention to make a tortfeasor pay for the harm he or she has caused.[64] It concludes that the potential for overcompensation is justified by "the reciprocal risk of settling with a defendant for less than that defendant's comparative share of the harm."[65] Its conclusion therefore turns on the weight it gives the policies it identifies.
I discuss public policy only reluctantly here. In my view the express words of AS 09.17.080(c) before amendment in 1997 both specify what courts must do in this case and *1039 prevent courts from invoking public policy to make a policy choice different than that reflected in the statute's words.[66] I discuss public policy here only to demonstrate that for claims that arose in 1993, the reduction the statute required until 1997 was consistent with a valid and important principle of tort law that had long been recognized and applied in Alaska, and that was not foreclosed by any public policy identified by the court today.
The policy choice underlying the court's analysis today confuses the pertinent policies and misconceives tort law in context of claims by victims of negligence, at least as to claims accruing before 1997. Thus, it is a controlling and fundamental principle of tort law, notwithstanding its Dickensian flavor of unreality, that negligently inflicted personal injuries can be fully compensated with money.[67] Money can make the personal injury plaintiff legally whole, whether or not medical science can. This means that the harm to the plaintiff is measured in dollars. And it means that when the plaintiff has received dollars equal to the monetary value of the harm suffered, the plaintiff is no longer suffering harm.[68] He is "cured." And if he receives dollars equal to half the monetary value of his harm, he is "half-cured." This means that his harm, in the eyes of the law, is only half what it was before he was paid. Thus, speaking hypothetically, if the plaintiff's harm is valued at $400,000 and he receives $100,000 from one tortfeasor in a settlement, by definition only $300,000 of harm remains uncompensated. Things are more complicated in dealing with a settlement and then a subsequent trial at which a jury finds the amount of damages, but the complication is conceptually unimportant. If the jury finds that the plaintiff suffered damages worth $400,000, his receipt of the prior $100,000 settlement proceeds means that the post-settlement value of plaintiff's harm is only $300,000.
This means that applying a policy of requiring a tortfeasor to pay for the harm he has "caused" necessarily raised this question (before 1997): what harm has the plaintiff suffered after he has been made partly whole? In the above hypothetical the uncompensated harm is $300,000, not $400,000. Public policy demands that the trial defendant pay for the harm attributable to him;[69] it does not demand that he pay for harm that has already been remedied, and no legislative history or tort reform history applicable to this case supports a conclusion to the contrary.[70] Policy does not require him to pay *1040 for harm that is already cured by partial settlement with another tortfeasor.[71] After the settlement, the second tortfeasor is no longer responsible for the first $100,000 worth of harm; as to that harm, plaintiff has already been fully compensated.[72] Because dollars define the harm, it is the uncompensated harm, and not the entire harm, for which the wrongdoer must pay. That is as far as the public policyof making the tortfeasor paygoes.[73]
The second problem is that the draft's perception of a broader public policy is almost certainly incorrect given the improbability that any tort reforms from 1986 onward had any purpose of requiring tortfeasors to pay plaintiffs more than the amount of their uncompensated damages.
Public policy in Alaska has long required a setoff (or reduction) for prior settlements. In Luth v. Rogers & Babler Construction Co., we stated that common law principles prohibit double recovery:
A cardinal common law principle establishes that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered. The doctrine prohibiting double recovery supports the rule that a payment received by the plaintiff for a covenant not to sue someone potentially liable in tort must be deducted from the damages recoverable from persons whose tort liabilities arise out of the same circumstances.[[74]]
Alaska Statute 09.16.040, adopted after Luth's accident, embodied the same rule. Nothing in the history of chapter 17 suggests that its proponents intended to make it possible for personal injury plaintiffs to recover more money than it took to make them whole. Instead, it would appear that the legislature intended to reduce the possibility of overcompensation when, in 1986, it broadened the categories of collateral benefits that require that a judgment be reduced.[75] Chapter 17 reflects a policy choice of preventing plaintiffs from recovering from tortfeasors any unsubrogated health benefits the plaintiffs have received from the plaintiffs' own insurance companies for the same injuries.[76] Nothing that happened in connection with the 1988 initiative suggests a more plaintiff-oriented policy.
In short, the subtractive reduction that former subsection .080(c) requires in this case is consistent with public policy. The broad public policies discussed in the court's opinion do not permit us to disregard the words of the statute.
5. Conclusion. I therefore conclude that we should affirm the reduction made by the superior court.
NOTES
[1] 29 P.3d 838, 840-41 (Alaska 2001).
[2] But as required by the settlement agreement, Petrolane was ordered to pay ten percent of Gannaway's judgment against Robles directly.
[3] Robles, 29 P.3d at 844.
[4] Id. at 844 n. 21.
[5] Id. at 846 n. 30.
[6] 984 P.2d 515 (Alaska 1999).
[7] Rausch v. Devine, 80 P.3d 733, 737 (Alaska 2003).
[8] Sisters of Providence in Washington v. A.A. Pain Clinic, Inc., 81 P.3d 989, 997 n. 4 (Alaska 2003).
[9] Robles argues that AS 09.17.080 was amended in 1997 and that the revised statute only applies to causes of action accruing on or after August 7, 1997, well after accrual of the cause of action in this case. Thus, he argues this provision is inapplicable. While much of AS 09.17.080 was revised in 1997, the language of subsection .080(d) was enacted by initiative in 1988, came into force on March 5, 1989, and was not affected by the 1997 amendment. Consequently, subsection .080(d) was the law in 1993, when the events underlying this case occurred. See Herscher v. State, Dep't of Commerce, 568 P.2d 996, 1001 (Alaska 1977) (quoting 1A SUTHERLAND: STATUTES AND STATUTORY CONSTRUCTION § 22.23, at 191 (4th ed.1972)):

Provisions of the original act or section which are repeated in the body of the amendment, either in the same or equivalent words, are considered a continuation of the original law. . . . The provisions of the original act or section re-enacted by the amendment are held to have been the law since they were first enacted, and the provisions introduced by the amendment are considered to have been enacted at the same time the amendment took effect.
[10] Because the second jury found that Petrolane was 43.75% responsible for the accident, Petrolane owed Robles 43.75% of Robles's already-determined damages of $871,216.19, or $381,157.08, plus pre-judgment interest, costs, and fees, if no offset applied.
[11] Kodiak Island Borough v. Roe, 63 P.3d 1009, 1013 (Alaska 2003) (internal citations omitted).
[12] Id.; Alaska Gen. Alarm Inc. v. Grinnell, 1 P.3d 98, 100 (Alaska 2000). The changes effected by the 1988 initiative went into effect in 1989.
[13] See 1988 Election Pamphlet for Initiative 87TOR2 (statement in support).
[14] Id.
[15] Id.
[16] 828 P.2d 745 (Alaska 1992).
[17] 887 P.2d 951 (Alaska 1994).
[18] Bohna, 828 P.2d at 758 (citing AS 09.16.040); Navistar, 887 P.2d at 958 n. 9 (citing former AS 09.17.090 and noting this statute was identical to AS 09.16.040(1)). The former AS 09.17.090 stated in relevant part:

(1) it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater.
Robles also cites to Luth v. Rogers & Babler Const. Co., 507 P.2d 761, 766 (Alaska 1973) (internal citations omitted) where our analysis depended upon the now-abrogated common law:
A cardinal common law principle establishes that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered. The doctrine prohibiting double recovery supports the rule that a payment received by the plaintiff for a covenant not to sue someone potentially liable in tort must be deducted from the damages recoverable from persons whose tort liabilities arise out of the same circumstances. This rule is applicable regardless of whether the covenantee, under a covenant not to sue, is a party to the suit.
[19] Krieser v. Hobbs, 166 F.3d 736, 740 (5th Cir. 1999). See also Waite v. Morisette, 68 Wash.App. 521, 843 P.2d 1121, 1123 (1993) (pro tanto rule "logical so long as joint and several liability remained in effect, because a nonsettling defendant could be liable for 100 percent of the damages regardless of the degree to which that party was at fault. Thus with joint liability, fairness dictated that credit be given for amounts paid to the claimant by settling defendants.").
[20] Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 431 (Tex.1984). See also Krieser, 166 F.3d at 743 ("[W]here liability is not joint-and-several, and each defendant instead bears liability for damages only proportionate to his own fault, there is no assessment of liability for damages common to the settling and non-settling defendants. Accordingly, the settlement has an entirely separate basis from the apportioned damages, and the one-recovery rule does not apply.").
[21] Robles also cites to Norcon, Inc. v. Kotowski, 971 P.2d 158 (Alaska 1999), where we offset the plaintiff's compensatory damages award against Norcon by the value of a prior settlement with another defendant. Id. at 171. Norcon was governed by the 1988 initiative, but in applying an offset, we cited only to Navistar Int'l Transp. Co. v. Pleasant, 887 P.2d 951, 957-58 (Alaska 1994), which was governed by the pre-1989 joint and several liability regime. Because full offsets are limited to joint and several liability systems, and because in Norcon we did not examine or discuss which type of offset is appropriate under several liability, we decline to apply Norcon to the present case. Moreover, Norcon is distinguishable in that it required full offset in order to avoid double recovery by the plaintiff, whereas in the present case full offset will only allow a wrongdoing defendant to escape accountability.

In Chenega Corp. v. Exxon Corp., 991 P.2d 769 (Alaska 1999), we approved a full offset of a $6,000,000 judgment against a $23,000,000 payment plaintiffs received from the federal Trans-Alaska Pipeline Liability Fund. Id. at 790-92. Chenega is at best inapposite and at worst actually undercuts Robles's argument for two reasons. First, in Chenega we did not consider apportionment of damages under AS 09.17.080(d) and expressly declined to consider the propriety of a full offset of the judgment against Exxon by the settlement payment tendered by Exxon's co-defendant, the Alyeska Pipeline Service Company. Id. at 790-92 and n. 96. Second, our primary concern in Chenega was double payment, not double recovery; an offset was justified because Exxon would have had to pay the Fund for its payments to the same plaintiffs for the same damages: "This . . . is not a situation in which denying a set off is necessary to prevent the wrongdoer from escaping accountability." Id. at 792. In this case, however, Robles is not exposed to double payment. Indeed, allowing a full offset would allow Robles to "escap[e] accountability" completely. Id.
[22] McDermott v. AmClyde, 511 U.S. 202, 208-217, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994) (discussing various approaches and adopting proportionate share rule).
[23] See Krieser, 166 F.3d at 743 (noting that courts in sixteen states have deemed full offsets to be incompatible with several liability regimes); Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc., 659 So.2d 249, 252 (Fla.1995) (describing proportionate share rule as "clearly the majority rule" and adopting same); Thomas v. Solberg, 442 N.W.2d 73, 77 (Iowa 1989) (applying proportionate offset rule and listing cases reaching same conclusion).
[24] RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY § 16 (1999) (recommending proportionate share approach under joint and several liability). See also id. at § B19 (recommending proportionate share approach under several liability).
[25] Id. at § 16 cmt. e (1999). Although § 16 generally discusses joint and several liability, the Restatement adopts the same rule regarding the liability of, nonsettling defendants in both the joint and several liability and pure several liability contexts. See id. at § 16, cmt. h. ("[T]he liability of a nonsettling defendant remains the same whether a credit is provided pursuant to this Section in the case of a joint and severally liable defendant or . . . in the case of a severally liable defendant."). See also id. at § B19 cmt. k ("As when joint liability and several liability is the governing rule, the plaintiff may recover more than the total damages determined by the factfinder as a result of making a beneficial settlement with some tortfeasors.").
[26] See id. at § 16 Reporter's Note cmt. e. ("Providing such a windfall to the nonsettling defendant also has the detrimental effect of discouraging settlements, both by the plaintiff who will not obtain the benefit of a favorable settlement with the first settling tortfeasor and by defendants who were not initial settling tortfeasors, because they can obtain the benefits of a less favorable settlement by the plaintiff with earlier settling tortfeasors only if they refuse to settle and continue to trial."). See also Roland v. Bernstein, 171 Ariz. 96, 828 P.2d 1237, 1239 (App.1991) (noting full offsets discourage settlements); Kussman v. City & County of Denver, 706 P.2d 776, 782 (Colo.1985) (same).
[27] Anchorage Sch. Dist. v. Anchorage Daily News, 779 P.2d 1191, 1193 (Alaska 1989) ("We recognize the important public policy served by those measures which encourage settlement."); Interior Credit Bureau, Inc. v. Bussing, 559 P.2d 104, 106 (Alaska 1977) ("Stipulations and settlements are favored in law because they simplify, shorten and settle litigation without taking up valuable court resources.").
[28] See Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 431 (Tex.1984) (citations omitted) ("[S]ettlement dollars are not the same as damages. Settlement dollars represent a contractual estimate of the value of the settling tortfeasor's liability and may be more or less than the proportionate share of the plaintiff's damages. The settlement includes not only damages, but also the value of avoiding the risk, expense, and adverse public exposure that accompany going to trial. There is no conceptual inconsistency in allowing a plaintiff to recover more from a settlement or partial settlement than he could receive as damages.").
[29] 984 P.2d 515 (Alaska 1999).
[30] Id. at 516.
[31] Id. at 518.
[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] Id. at 518 n. 14.
[37] Id. (quoting RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY. § 33 cmt. f (Proposed Final Draft Mar. 22, 1999)).
[38] McLaughlin v. Lougee, 137 P.3d 267, 279 (Alaska 2006).
[39] 874 P.2d 949, 957 n. 18 (Alaska 1994).
[40] Id. Contrary to the dissent's assertion, nothing in Benner "required" this court to interpret the reference in AS 09.17.080(a) to AS 09.16.040.
[41] Brian Garner seems to support this reading; he views the phrase "subject to" as essentially redundant when used in a statute to refer to other provisions of law:

subject to the provisions of this Act. This REDUNDANCY appears frequently in common-law STATUTE-DRAFTING. A variation is subject to any contrary provision of this Act. As often as not, it signals poorly organized drafting; certainly it makes the interpreter's job no easier.
Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE at 840 (Oxford University Press 1995).
[42] 821 P.2d 714 (Alaska 1991).
[43] Id. at 717.
[44] Robles v. Shoreside Petroleum, Inc., 29 P.3d 838, 844 n. 21, 846 (Alaska 2001).
[45] See the discussion supra at pp. 1024-25.
[46] Robles, 29 P.3d at 846.
[47] K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 718 (Alaska 2003) (citations omitted).
[48] City of Kodiak v. Samaniego, 83 P.3d 1077, 1082 (Alaska 2004) (citation omitted).
[49] Jackson v. American Equity Ins. Co., 90 P.3d 136, 141 (Alaska 2004) (citing Reich v. Cominco Alaska, Inc., 56 P.3d 18, 25 (Alaska 2002)).
[50] General Motors Corp. v. Farnsworth, 965 P.2d 1209, 1214 (Alaska 1998) (citing Vincent By Staton v. Fairbanks Mem'l Hosp., 862 P.2d 847, 851 (Alaska 1993)).
[51] Robles v. Shoreside Petroleum, Inc., 29 P.3d 838, 841 (Alaska 2001).
[52] Id. at 846.
[53] Wolff v. Arctic Bowl, Inc., 560 P.2d 758, 763 (Alaska 1977) (internal citations omitted).
[54] State, Commercial Fisheries Entry Comm'n v. Carlson, 65 P.3d 851, 859 (Alaska 2003) (internal quotations and citations omitted).
[55] Conner v. Stelly, 830 So.2d 1102, 1110 (La. App.2002). See also Watts v. Seward School Bd., 421 P.2d 586 (Alaska 1966) (Rabinowitz, J., dissenting in part and concurring in part), vacated on other grounds, 391 U.S. 592, 88 S.Ct. 1753, 20 L.Ed.2d 842 (1968) (explaining that law of case promotes judicial efficiency by narrowing issues in successive stages of litigation).
[56] Robles, 29 P.3d at 842-44.
[57] Id. at 846.
[58] Petrolane also cites AS 09.17.080(b), which provides that "[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault, and the extent of the casual relation between the conduct and the damages claimed." Petrolane argues that the statutory language supports its argument that the second jury was required to make new determinations regarding the parties' negligence and related causation. However, this statute only requires that such determinations be made by a fact-finder. Where, as here, a prior fact-finder made determinations of negligence that are unaffected on remand, these determinations should not be revisited. Cf. State v. Kaatz, 572 P.2d 775, 785 n. 11 (Alaska 1977) ("If a new trial on the issue of apportionment is granted, the court should instruct the jurors that (1) they must assign some percentage of the negligence to each party, (2) the total damages are in the sum found by the previous trier of fact (unless the same jury is also retrying the damages issue), and (3) their sole function is to apportion the negligence between the parties.").
[59] 48 P.3d 1170 (Alaska 2002).
[60] Id. at 1173.
[61] Id. at 1175-76.
[62] Id. at 1176.
[63] Id.
[64] Petrolane's argument also contradicts the Neary hypothetical discussed above. See supra Part IV.A.1, pp. 14-15. In Neary we noted that in a second trial by the same plaintiff against a different defendant, "there should be a determination of the comparative fault" of all parties, but that the second defendant would be "entitled to a ruling based on collateral estoppel that P and D1 are negligent," although "the percentage of their total fault . . . cannot be specified, for that issue has not been litigated." Universal Motors, Inc. v. Neary, 984 P.2d 515, 518 (Alaska 1999).
[1] Op. at 1020, 1021, 1023.
[2] Op. at 1019.
[3] In Robles's case, two different juries returned the corresponding findings; the first determined the amount of damages and the second allocated fault. This circumstance is irrelevant to the issue presented.
[4] Op. at 1023.
[5] More accurately, it appears that the appellant asks us to apply the 1988 initiative that amended AS 09.17.080(d) and adopted pure several liability.
[6] Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin, 828 P.2d 745, 758 (Alaska 1992).
[7] As first enacted in 1986, subsection .080(c) referred to "AS 09.17.090." Ch. 139, § 1, SLA 1986. The legislature substituted "AS 09.16.040" in 1987. Ch. 14, § 16, SLA 1987.
[8] The 1988 initiative repealed chapter 16, including AS 09.16.040, but did not delete the three references to section .040 in AS 09.17.080(a) and (c). 1987 Initiative Proposal No. 2, adopted in 1988. The initiative's amendments became effective March 5, 1989.
[9] Ch. 26, § 13, SLA 1997. The legislature also amended subsections .080(a) and (b), but not subsection .080(d). Ch. 26, §§ 11-12, SLA 1997. The 1997 changes applied to causes of action accruing on or after August 7, 1997. Ch. 26, § 55, SLA 1997. The text of subsection .080(c) deleted in 1997 therefore applies to this case because the cause of action accrued in 1993.
[10] The math is as follows: ($100,000 x 0.50)-$80,000 = -$30,000. Because no negative award is possible here, there is no recovery.
[11] The math for the comparative approach requires dual calculations. The first calculates the maximum amount that the nonsettling tortfeasor should be required to pay as follows: $100,000 × .50 = $50,000. The second calculates the maximum amount that the plaintiff may receive without receiving a partial double recovery as follows: $100,000-$80,000 = $20,000. Taking the lower of the dual calculations will ensure that both policiesthe avoidance of joint liability and the avoidance of a double recoveryare satisfied.
[12] The dual calculations here would be as follows. The first would be: $100,000 x .50 = $50,000. The second would be: $100,000-$20,000 = $80,000. Again, selecting the lower of the two results will ensure that the nonsettling tortfeasor pays only for the damages he has caused while also ensuring that the plaintiff does not receive a double recovery.
[13] Navistar Int'l Transp. Corp. v. Pleasant, 887 P.2d 951, 956 (Alaska 1994).
[14] The voters approved the 1987 Initiative Proposal No. 2 repealing chapter 16 in 1988.
[15] Benner v. Wichman, 874 P.2d 949 (Alaska 1994).
[16] Id. at 957 n. 18 (interpreting AS 09.17.080(a)'s reference to AS 09.16.040).
[17] Op. at 1023.
[18] Id.
[19] The clause is not a mere redundancy, unlike the generic phrase ("subject to the provisions of this Act") condemned by Brian Garner. Bryan A. Garner, A DICTIONARY OF MODERN LEGAL USAGE at 840 (Oxford University Press 1995). The clause here is specific: it specifies the topic and the required action (reduction) and it also provides a specific statutory cross-reference.
[20] Op. at 1024.
[21] Op. at 1024.
[22] 1987 Initiative Proposal No. 2. The initiative amended AS 09.17.080(d), repealed AS 09.16, and made these changes applicable to all causes of action accruing after the effective date of the act. Id. The initiative did not amend, or mention, AS 09.17.080(c).
[23] See In re Adoption of Missy M., 133 P.3d 645, 650 (Alaska 2006) (holding that effect should be given to all words of statute so that none are rendered superfluous); Mech. Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety, 91 P.3d 240, 248 (Alaska 2004) (presuming "`that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous'" (quoting Kodiak Island Borough v. Exxon Corp., 991 P.2d 757, 761 (Alaska 1999))).
[24] See City of Cordova v. Medicaid Rate Comm'n, Dep't of Health & Soc. Servs., State, 789 P.2d 346, 352 (Alaska 1990) ("It is a maxim of construction that specific statutes should be given precedence over more general ones.").
[25] Op. at 1019, 1020.
[26] See McLaughlin v. Lougee, 137 P.3d 267, 277 (Alaska 2006) ("The scant legislative history demonstrates that the initiative's supporters were concerned almost exclusively with ensuring that defendants would be liable only for their share of fault." (quoting Alaska Gen. Alarm, Inc. v. Grinnell, 1 P.3d 98, 106 (Alaska 2000))).
[27] See Election Pamphlet for 1987 Initiative Proposal No. 2 (87TOR2) (statement in support).
[28] See id. (statement in opposition).
[29] See House Floor Debate on SB 337 (May 8, 1986) (statement of Rep. Pearce) (noting that "the real victims that I think we're all here working for are the people who can't get insurance because their rates have gone out of sight" and that "society has gone overboard for the victims"), transcribed in Respondent's Brief, FMC Corp. v. Craig Taylor Equip. Co., No. S-2261 (Alaska 1988), App. B, at 24-25; id. at 57 (statement of Rep. Pignalberi) (rebutting criticism that tort reform proposal would have no effect on insurance rates); id. at 109 (statement of Rep. Miller) (arguing that anything less than pure several liability is unfair to defendants); id. at 111 (statement of Rep. Boucher) (arguing that tort reform is necessary because of "general greed of our society"); id. at 116 (statement of Rep. Hanley) (noting that "I think there are members among us who, perhaps, even think that the simple several liability . . . is . . . a fair approach"); Senate Floor Debate on SB 337 (May 5, 1986) (statement of Sen. Faiks) (noting that Director of Division of Insurance believed that limitations on joint and several liability would allow division "to gain rate reductions, new markets and increased capacity"), transcribed in Respondent's Brief, FMC Corp. v. Craig Taylor Equip. Co., No. S-2261 (Alaska 1988), App. A, at 33; id. at 67 (statement of Sen. Kelly) (arguing that the bill would lower insurance premiums and increase insurance availability); see also Letter from Governor Bill Sheffield to Sens. Faiks & Sackett, Co-Chairs, Senate Finance Committee and Rep. Miller, Chairman, House Judiciary Committee, at 1 (Apr. 28, 1986) (noting that "the real goal of tort reform is affordable insurance"); Election Pamphlet for 1987 Initiative Proposal No. 2 (87TOR2) (statement in support) (arguing that joint and several liability is "unfair" because it "forces people to pay for damages caused by somebody else"); id. (statement in opposition) (arguing that if several liability is enacted, "the insurance company wins and the victim loses"); cf. ch. 26, § 1, SLA 1997 (explaining that purposes of 1997 tort reform act included "discouraging frivolous litigation," "alleviat[ing] the high cost of malpractice insurance premiums," and "fostering an environment likely to control the increase of liability insurance rates").
[30] Some legislators reluctantly supported the 1986 tort reform bill that introduced partial, or "modified," joint liability, because this represented a compromise seen as less harmful to plaintiffs than pure several liability ultimately adopted in 1988. See Senate Floor Debate, supra note 29, at 34 (statement of Sen. Josephson) (explaining that "many of us who would prefer to continue to have the doctrines of tort law developed in the courts arising out of concrete fact situations with advocacy on both sides are yielding, in a sense, our better judgment and saying we're willing to legislate because there is that crisis or the perception of a crisis"); id. at 25 (statement of Sen. Rodey) (describing his proposal for modified joint and several liability as a "middle ground"). One legislator reasoned that a benefit of tort reform would be that more potential tortfeasors could afford liability insurance, and thus might increase the chances tortfeasors would be able to respond to tort claims. See id. at 67-68 (statement of Sen. Eliason).
[31] See Election Pamphlet for 1987 Initiative Proposal No. 2 (87TOR2) (statement in support).
[32] See ch. 80, § 1, SLA 1970 (codified as amended at AS 09.16.010.060) (codifying joint and several liability); ch. 139, § 11, SLA 1986 (establishing several and modified joint liability); see also Kodiak Island Borough v. Roe, 63 P.3d 1009, 1013 (Alaska 2003) (explaining history of joint and several liability in Alaska).
[33] Universal Motors, Inc. v. Neary, 984 P.2d 515 (Alaska 1999).
[34] See former AS 09.17.080(a) and .080(a)(2) (1993) (both referring to parties and persons released from liability "under AS 09.16.040").
[35] See Benner, 874 P.2d at 958 n. 18 (consulting repealed AS 09.16.040 in interpreting AS 09.17.080(a)).
[36] Navistar Int'l Transp. Corp. v. Pleasant, 887 P.2d 951 (Alaska 1994).
[37] Id. at 953-54. When Pleasant was injured, Alaska had a system of modified joint and several liability, which capped joint liability against a tortfeasor less than fifty percent at fault at twice its percentage of fault. See former AS 09.17.080(d) (1987).
[38] Navistar, 887 P.2d at 954.
[39] Id.
[40] Id. at 956. The specific facts of Navistar are complex because of the number of alleged tortfeasors. Here is how the superior court calculated the judgment. It first subtracted the portion of the settlement allocated to compensatory damages ($1,525,046) from the jury's total damages verdict and prejudgment interest ($3,431,-459.61). Id. The court then further reduced the award by the amount of a settlement with a second tortfeasor ($200,000) and plaintiff's ten percent comparative negligence ($342,510.10) for a total of $1,357,544.94. Id. The court compared this total to the amount called for by the modified joint and several liability system in force at the time. Id. For the modified joint and several liability calculation, the court deducted the enhanced prejudgment interest on the two settlements from $3,431,459.61 and multiplied this amount by twice the proportion of Navistar's fifteen percent share of the fault (.15 × 2 = .30) for a total of $1,027,530.31. Id. Because this modified pro rata approach yielded an amount less than the $1,357,544.94 called for by the pure pro tanto approach, the court entered judgment for the smaller amount. Id. Had the superior court subtracted the entire $2.1 million in making the first calculation, the result would have been lower than $1,027,530.31 and the superior court presumably would have entered judgment for that lower amount.
[41] Id. It "tested" the pro rata reduction result against the pro tanto reduction result and based the judgment on the lower of the two. Id. It thus applied both AS 09.17.080(c) and AS 09.17.080(d) (as it then read) by reading each as setting the remaining defendant's maximum liability.
[42] Id.
[43] Id. at 958.
[44] Id. Because the superior court also failed to make a second, unrelated reduction, the result of our holding was that the defendant owed nothing to the plaintiff. Id.
[45] Norcon, Inc. v. Kotowski, 971 P.2d 158 (Alaska 1999).
[46] Id. at 163, 171.
[47] Id. at 171.
[48] Id. at 163.
[49] Id. at 171.
[50] Id.
[51] Universal Motors, Inc. v. Neary, 984 P.2d 515, 516 (Alaska 1999).
[52] Id. at 516.
[53] Id. at 518.
[54] Id.
[55] Id. at n. 13.
[56] Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin, 828 P.2d 745, 758-59 (Alaska 1992).
[57] Id. at 758 (quoting Cullen v. Atchinson, Topeka & Santa Fe Ry. Co., 211 Kan. 368, 507 P.2d 353, 362 (1973) (alteration in Bohna)).
[58] Id. at 758-59.
[59] Chenega Corp. v. Exxon Corp., 991 P.2d 769, 790 (Alaska 1999) ("[P]ayments made to the victim from non-collateral sourcessuch as the tortfeasor's insurance company or a joint tortfeasorreduce the tortfeasor's liability.").
[60] Op. at 1020. The regime was enacted in 1988 when voters approved the 1987 initiative proposal; the regime became effective in 1989. See 1987 Initiative Proposal No. 2.
[61] Navistar, 887 P.2d at 956.
[62] We overrule our decisions only when "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent." State v. Fremgen, 914 P.2d 1244, 1245 (Alaska 1996) (quoting State v. Dunlop, 721 P.2d 604, 610 (Alaska 1986) (internal quotation marks omitted)); see also Thomas v. Anchorage Equal Rights Comm'n, 102 P.3d 937, 943 (Alaska 2004) ("The stare decisis doctrine rests on a solid bedrock of practicality: no judicial system could do society's work if it eyed each issue afresh in every case that raised it.") (quoting Pratt & Whitney Canada, Inc. v. Sheehan, 852 P.2d 1173, 1175 (Alaska 1993) (internal quotation marks omitted)). "In recognizing the importance of this doctrine, we have consistently held that a party raising a claim controlled by an existing decision bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling." Id. at 943.
[63] Op. at 1019.
[64] Op. at 1019 (citing Election Pamphlet for 1987 Initiative Proposal No. 2 (87TOR2) (statement in support)).
[65] Op. at 1021.
[66] The history of the initiative, including the explanation on the ballot, is not so clear on the reduction topic as to nullify the words of AS 09.17.080(c).
[67] See McDougald v. Garber, 73 N.Y.2d 246, 538 N.Y.S.2d 937, 536 N.E.2d 372, 374-75 (1989) (noting that recovery of noneconomic damages "rests on the legal fiction that money damages can compensate for a victim's injury. We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong." (internal quotation marks omitted)).
[68] See Livingstone v. Rawyards Coal Co. (1880) 5 App. Cas. 25, 39 (U.K.) (famously defining the measure of damages as "that sum of money which will put the party who has been injured, or who has suffered, in the same position as he would have been in if he had not sustained the wrong for which he is now getting his compensation or reparation"), quoted in HARVEY MCGREGOR, McGREGOR ON DAMAGES 10 (14th ed.1980).
[69] See W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS § 1, at 6 (5th ed. 1984) ("The purpose of the law of torts is to adjust [losses or injuries sustained as a result of the activities of others], and to afford compensation for injuries sustained by one person as the result of the conduct of another." (quoting Cecil A. Wright, Introduction to the Law of Torts, 8 CAMBRIDGE L.J. 238 (1944))).
[70] See Noffsinger v. State, 850 P.2d 647 (Alaska App.1993) (suggesting that legislature may have switched to several liability system because of "inequity" that results from joint and several liability, where "among several independently negligent parties whose conduct combines to cause an injury, the party who is capable of payingalthough only partially responsiblewill end up paying the full award"); Laubach v. Morgan, 588 P.2d 1071, 1075 (Okla.1978) (noting that legislative enactment of comparative negligence statute required judicial abolishment of joint and several liability because "[h]olding a defendant tortfeasor, who is only 20 percent at fault, liable for entire amount of damages is obviously inconsistent with the equitable principles of comparative negligence"), quoted in 3 STEIN ON PERSONAL INJURY DAMAGES TREATISE § 14:24 (3d ed.1997).
[71] As the United States Court of Appeals for the District of Columbia has explained:

[A] cardinal principle of law is that in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered. For when the plaintiff has accepted satisfaction in full for the injury done him, from whatever source it may come . . . he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages. The office of compensatory damages is to make the plaintiff whole, but certainly not more than whole.
Kassman v. American Univ., 546 F.2d 1029, 1033 (D.C.Cir.1976) (internal footnotes and quotation marks omitted).
[72] See KEETON supra note 69, § 1, at 7 ("The civil action for a tort . . . is commenced and maintained by the injured person, and its primary purpose is to compensate for the damage suffered, at the expense of the wrongdoer.").
[73] See id. § 1, at 9 ("The idea of punishment, or of discouraging other offenses, usually does not enter into tort law. . . . ").
[74] Luth v. Rogers & Babler Constr. Co., 507 P.2d 761, 766 (Alaska 1973).
[75] See ch. 139, § 1, SLA 1987 (codified as amended at AS 09.17.070).
[76] In Chenega Corp. v. Exxon Corp., 991 P.2d 769, 791 (Alaska 1999), we explained that AS 09.17.070 "limits the circumstances in which a victim can receive double recovery, while enhancing the chances that a tortfeasor may not be held fully accountable."